[Cite as *In re J.M.*, 2021-Ohio-3961.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| J.M., et al. | : | CASE NOS. CA2021-06-072<br>CA2021-06-073 |
| | : | CA2021-07-083<br>CA2021-07-084 |
| | : | |
| | : | O P I N I O N<br>11/8/2021 |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JN2019-0015 & JN2019-0016

Garrett Law Offices, and Dawn S. Garrett, for appellant.

Michael T. Gmoser, Butler County Prosecuting Attorney, and Willa Concannon, Assistant Prosecuting Attorney, for appellee.

Amy Ashcraft, guardian ad litem.

D.E., father, pro se.


**HENDRICKSON, J.**

{¶1}  Appellant, the biological mother of Ja.M. and Jo.M ("Mother"), appeals from a decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of her children to appellee, the Butler County Department of Job and

Family Services, Children Services Division ("BCDJFS" or "the Agency"). For the reasons discussed below, we affirm the juvenile court's decision.

{¶2} Ja.M. and Jo.M., twin boys born on October 15, 2013, resided with Mother until being removed from her care on November 6, 2018.[1] On that date, police responded to a home where Mother, her boyfriend, Ja.M., Jo.M., and one of Mother's cousins were staying. Officers found Jo.M. had been left alone with Mother's cousin, who had overdosed while Jo.M. was present. Officers found drugs, needles, and other drug paraphernalia within reach of the children, including in Mother's and her boyfriend's bedroom. Mother was subsequently arrested and charged with child endangerment and Jo.M. and Ja.M were placed in the care of nonrelatives pursuant to a voluntary safety plan.

{¶3} On January 17, 2019, BCDJFS filed a complaint alleging Jo.M. and Ja.M. were dependent children. In support of its complaint, the Agency referenced the November 6, 2018 incident and Mother's arrest and noted that Mother was incarcerated and had an anticipated release date of April 4, 2019. The complaint sought to keep Ja.M. and Jo.M. in the care of the nonrelatives who had been caring for the boys.

{¶4} After receiving the Agency's complaint, the juvenile court granted emergency temporary custody to the nonrelatives caring for the children. The juvenile court also appointed a guardian ad litem for Jo.M. and Ja.M. Mother was granted visitation with the children, to be supervised by the nonrelative caregivers.

{¶5} On March 6, 2019, Jo.M. and Ja.M. were adjudicated dependent following a stipulation by Mother. Mother waived a bifurcated hearing and the juvenile court entered a

---

1. Jo.M.'s and Ja.M.'s biological father has not been involved in the boys' lives. He did not participate in any case plan services, did not appear at the permanent custody hearing, and is not a party to the present appeal.

dispositional order placing the children in the continued temporary custody of the nonrelatives who had been caring for them. At this time, the court adopted a case plan for Mother's reunification with the children. The case plan required Mother to complete a substance abuse and mental illness ("SAMI") assessment and to follow through with any recommended treatments as a result of that assessment, including attending outpatient drug and alcohol treatment, attending mental health counseling, and obtaining a psychiatric evaluation for medication management. Mother was also required to complete random drug screens, maintain stable housing and income, and participate in an in-home parenting education program. Mother's longtime boyfriend, who resided with Mother and wished to be involved in the children's lives, was also required to complete a SAMI assessment and follow through with any recommendations. The court continued Mother's supervised visitation with the children but ordered that the visitations be supervised through the Family Healing Center.

{¶6} On July 30, 2019, the Agency filed an emergency motion for change in temporary custody. The Agency sought temporary custody of the children as the nonrelatives were no longer able to care for Jo.M. and Ja.M. That same date, the juvenile court granted the Agency's motion and the children were placed in the care of a foster family.

{¶7} Mother made limited progress on her case plan, failing to consistently attend counseling, to take or pass drug screens, to maintain stable housing and income, or to routinely attend visitation with the children. As a result, on August 3, 2020, the Agency moved for permanent custody of Jo.M. and Ja.M.

{¶8} A hearing on the motion was scheduled for December 17, 2020. Two weeks

before the hearing was set to occur, Mother moved for a continuance to a "later date," asserting that "due to [the] COVID-19 [pandemic], mother does not feel safe being in the courthouse or court room with other individuals." Mother's motion was opposed by BCDJFS and the children's guardian ad litem. The juvenile court denied Mother's motion for continuance, noting that the court had imposed strict COVID-19 safety protocols in the courtroom and that Mother had the option of participating in the proceedings remotely.

{¶9} On December 15, 2020, the children's guardian ad litem filed a report recommending that permanent custody be granted to the Agency. The guardian ad litem noted that since the children had been removed from Mother's care in November 2018, Mother had failed to consistently visit with the children or make any real progress on the case plan. The guardian ad litem believed granting permanent custody to the Agency was "in the best interests of the children and their only option for permanency."

{¶10} At the commencement of the December 17, 2020 permanent custody hearing, Mother's counsel orally moved for a continuance of the proceedings on the grounds that Mother was ill and unable to participate due to COVID-19 exposure. Though the Agency and the children's guardian ad litem opposed continuing the matter, arguing Mother was merely seeking to delay proceedings, the court granted a three-month continuance.

{¶11} On March 25, 2021, a permanent custody hearing was held before a juvenile court magistrate. The magistrate heard testimony from the supervisor who oversaw Jo.M.'s and Ja.M.'s case with the Agency, the children's foster mother, Mother, and one of Mother's friends.[2]

---

2. Mother appeared 45 minutes late at the March 25, 2021 permanent custody hearing. Mother's counsel, however, appeared timely and represented Mother's interests in her absence. Mother was permitted to testify at the hearing upon her arrival.

{¶12} The supervisor discussed the Agency's history with Mother, noting that BCDJFS had been involved since November 6, 2018, when Jo.M. had been left alone with a cousin who overdosed while caring for the child. As drugs and drug paraphernalia, including mirrors coated with white residue and needles, were found in the home, the children were removed and placed in the custody of nonrelatives. The children remained in the nonrelatives care until July 30, 2019, when they were placed in the Agency's temporary custody. The children have been placed in the same foster family's home since July 30, 2019 and are doing well in that foster placement.

{¶13} The supervisor noted that though a case plan for reunification had been developed in February 2019 and adopted by the juvenile court in March 2019, Mother had made limited progress on her case plan. Mother completed a SAMI assessment and was diagnosed with substance abuse issues, bipolar disorder, anxiety, and depression. It was recommended that she obtain drug and alcohol treatment, mental health counseling, and a psychiatric evaluation to manage her medication, as well as attend an employment success program and an in-home parenting education program. Mother "declined" to attend the employment program. She did engage in counseling at Access Counseling in Middletown, Ohio in March 2019. However, her attendance was sporadic and she frequently refused to submit to drug screens. Mother was unsuccessfully discharged from Access Counseling in May 2019.

{¶14} Mother did not attend any other counseling services until August 2020, when she was referred to The Next Right Thing. After obtaining an evaluation and being diagnosed with an amphetamine-type substance use disorder, Mother began outpatient treatment and counseling. Due to the COVID-19 pandemic, Mother's appointments were

held virtually or by telephone. For a couple of months, Mother regularly attended counseling, though she refused to complete drug screens when requested by The Next Right Thing. By November 2020, Mother had begun missing counseling sessions. The last session she attended before being unsuccessfully discharged from the program was on November 24, 2020. When discharged, it was recommended that Mother obtain further outpatient substance abuse treatment and mental health services.

{¶15} Mother did not seek additional treatment until a few weeks before the permanent custody hearing. In March 2021, Mother was once again referred to Access Counseling for treatment. However, because it had been years since Mother's last SAMI assessment, Access Counseling required a new assessment before treatment could begin. Although Mother had completed paperwork with Access Counseling, she had not undergone the assessment or started treatment as of the date of the permanent custody hearing.

{¶16} The Agency supervisor discussed the difficulty she had in getting Mother to comply with random drug screens. Mother frequently refused or failed to show up for drug screens requested by the Agency, Access Counseling, or The Next Right Thing. When Mother did comply with screenings, the majority of her screens came back positive. More than a dozen times, Mother tested positive for either methamphetamines, amphetamines, benzodiazepines, alcohol, or some combination of those substances. However, in December 2019, Mother had three negative screens. Mother also had two negative drug screens in the first week of March 2021.

{¶17} Mother struggled to maintain stable housing during the pendency of the case. Mother was incarcerated multiple times, spending approximately 30 days in the Middletown

jail and 80 to 90 days in the Butler County jail for various offenses, including child endangerment, forgery, identity theft, and an attempt offense.[3] When she was not in jail, Mother and her longtime boyfriend moved between the homes of several family members. Mother acknowledged to the Agency that living with relatives was not ideal or "a good situation." Nonetheless, after moving out of the home they shared with the cousin who overdosed, Mother and her boyfriend moved in with Mother's uncle for about 18 months in 2019 and 2020. Mother and her boyfriend then moved in with the children's maternal grandmother and great-grandmother in Kentucky for about four or five months. In August or October 2020, Mother and her boyfriend moved to Centerville, where they rented a studio apartment for three months. Mother and her boyfriend then bought a camper and moved into a campground in Carmody for a couple of months. In mid-January 2021, Mother and her boyfriend rented a two-bedroom townhome in Franklin. The second bedroom was intended for Jo.M. and Ja.M. The Agency visited the townhome and did not observe any safety issues or hazards. However, the supervisor still had concerns about the stability of Mother's housing, noting the brief period of time Mother had been in the townhome. Mother's unstable housing, in combination with her lack of progress in her substance abuse treatment, prevented the Agency from making a referral for in-home parenting classes.

{¶18} The supervisor expressed concern over Mother's employment history. The supervisor noted Mother had reported working inconsistently throughout the pendency of the case. The week of the permanent custody hearing, Mother obtained employment with a Walmart distribution center. However, as Mother had only started the position two days

---

3 The specifics of Mother's "attempt" offense were not discussed at the permanent custody hearing or within the exhibits admitted into evidence.

before the permanent custody hearing began, this was not long enough for Mother to have achieved stability in her employment.

{¶19} Mother's relationship with her longtime boyfriend and his lack of involvement in the case plan was also concerning to the supervisor. Mother's boyfriend has a criminal history involving illegal substances. He was arrested and charged with drug abuse (methamphetamines) in February 2019. In March 2019, Mother's boyfriend was again arrested and charged with methamphetamine-related crimes and tampering with records. Although Mother's boyfriend admitted to the police he had a drug abuse problem, he denied having any substance abuse issues when asked by the Agency. Mother's boyfriend was diagnosed with an amphetamine use disorder and briefly attended counseling at The Next Right Thing. However, near the end of 2020, after failing to attend counseling for more than two months, he was unsuccessfully discharged. Mother's boyfriend has not reengaged in any treatment or counseling services and has refused to submit to any drug screens.

{¶20} The supervisor noted that since the children were removed from Mother's care in November 2018, Mother's visitation with the children had never progressed beyond supervised visitation. Visitation originally occurred in the home of the nonrelative caregivers before being moved to the Family Healing Center. Once the Agency was awarded temporary custody, visitation continued at the Family Healing Center. Mother's visitation remained at the "most restricted" supervision level, which required Mother to have a supervisor overseeing the visit "within eye contact, ear contact, right next to them."

{¶21} Mother did not consistently exercise visitation with the children. On May 24 2019, after Mother missed multiple consecutive visits without calling to cancel, Mother was removed from the visitation schedule. Mother was added back to the visitation schedule in

August 2019.  In October 2019, Mother's visitation was again suspended after she failed to attend consecutive visitations.  Visits resumed on November 13, 2019 after Mother met with the director of the visitation center.

{¶22} Because of the COVID-19 pandemic, Mother's visitations were moved to virtual visitations.  The Family Healing Center continued to supervise the visits over FaceTime.  Mother often cut the virtual visitations short, and the visitation supervisor reported that Mother had minimal communication during the virtual visits and needed guidance on how to engage the children.  As of May 2020, Mother started missing visitations with some frequency, including missed visitations in the months of August 2020, October 2020, and November 2020.  On December 17, 2020, the juvenile court suspended Mother's visitation until Mother submitted two consecutive negative drug screens and reengaged in mental health and substance abuse treatment.  As of the date of the permanent custody hearing, Mother had not complied with the latter of those requirements and her visitation had not been reinstated.

{¶23} Foster Mother testified Jo.M. and Ja.M. have been in her and her husband's care since the end of July 2019, and they have an interest in adopting the boys.  Jo.M. and Ja.M. are bonded to their foster parents and their foster parents' two children.  Jo.M. and Ja.M. are in first grade and are doing well in school.  Both boys attend counseling on a weekly or biweekly basis depending on their counselor's availability.  The boys enjoy playing basketball, riding bikes, trampolining, and spending time on the foster family's small hobby farm.

{¶24} Foster Mother testified about Jo.M. and Ja.M.'s visitations with Mother, noting that since the visitations moved online, Mother has missed a number of the visits.  In the

Fall of 2020, Mother missed four consecutive visits. When Mother did appear for the visitations, she did not appear engaged and often ended the calls early. Foster Mother recalled that on the boys' birthday, Mother appeared 12 minutes late and ended the visit after three minutes with the boys. Foster Mother acknowledged that given the boys' young age, they sometimes had difficulty staying focused and engaged during the video calls. However, Foster Mother noted that other relatives who had video calls with Jo.M. and Ja.M., including maternal grandmother and an older sibling, were able to engage with the children.

{¶25} Mother testified that she and the children are bonded. Mother claimed that prior to the COVID-19 pandemic, she routinely visited with the children, missing only a few visits. Mother brought Jo.M. and Ja.M. lunch and they played games and did art and crafts projects together. Once visitations were made virtual, Mother testified the visits became "torture" and were "heartbreaking." Mother claimed the boys did not like to be on the phone and would get bored, necessitating an early end to the visitations. Mother also testified that there were times the foster family's schedule resulted in a missed visitation and, with the exception of one occurrence, the missed visitations were not made up.

{¶26} Mother stated she was making progress on her case plan, noting that transportation problems hindered her ability to attend counseling and substance abuse meetings earlier in the case. However, Mother obtained a vehicle in July 2020. She has since sought to restart substance abuse and mental health services at Access Counseling. In addition to transportation difficulties, Mother explained she had stopped attending services at Access Counseling in 2019 because she was upset her counselor reported certain information to the Agency against her wishes.

{¶27} Mother testified that she now lives in housing suitable for caring for Jo.M. and

Ja.M. She has also recently started a new job with Walmart, one that has her working from 4:00 p.m. until 2:00 a.m. When questioned about what she would do for childcare if she regained custody of the children, Mother indicated she would "try to change shifts."

{¶28} Mother admitted that since the Agency's involvement, both she and her boyfriend spent periods of time in jail for various criminal offenses. She further admitted that both she and her boyfriend have struggled on and off with drug abuse. She claimed that she did not miss as many drug screens as the Agency suggested, stating that she had been screened while she was on probation. According to Mother, her drug screens through the probation department were negative for illegal substances. This led Mother to believe that the results of the drug screens administered by the Agency, which often came back positive for methamphetamine and amphetamines, were "not correct."

{¶29} Mother also testified that she had been prescribed trazadone, latuda, and valium as a result of her 2016 diagnoses for bipolar disorder, anxiety, and depression. Mother, on her own initiative, stopped taking the prescribed medication because "taking mind-altering drugs does not help." Mother also testified that she was diagnosed with posttraumatic stress disorder and obtained a marijuana prescription card, though the prescription card was not provided to the Agency or presented as evidence.

{¶30} Mother's friend testified that she and Mother have been friends since they were in second grade. Mother's friend testified that Mother was loving and very bonded to Jo.M. and Ja.M. Though Mother could be "a little lenient" with the children, the friend never observed any behavior that caused her to be concerned with Mother's ability to parent the children. However, on cross-examination, the friend admitted she had not been aware of Mother's substance abuse problems and had not observed Mother interact with the children

since before the children were removed from Mother's care in November 2018.

{¶31} After considering the evidence and testimony presented at the hearing, the magistrate issued a decision granting the Agency permanent custody of Jo.M. and Ja.M. The magistrate found that it was in the children's best interest for permanent custody to be awarded, that the children had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period, and that despite reasonable efforts by the Agency to prevent the need for placement of the children outside the home, the children could not and should not be placed with their mother or father within a reasonable amount of time.

{¶32} Mother filed timely objections to the magistrate's decision, arguing that it was not in the children's best interest for permanent custody to be granted to the Agency, that the magistrate's decision was not supported by clear and convincing evidence, and that the sufficiency and weight of the evidence supported Mother regaining legal custody of the children. On May 25, 2021, the juvenile court held a hearing on Mother's objections. Following the hearing, on June 6, 2021, the juvenile court overruled Mother's objections and adopted the magistrate's decision in full.

{¶33} Mother now appeals the juvenile court's decision, raising two assignments of error for review.

{¶34} Assignment of Error No. 1:

{¶35} [MOTHER] WAS DENIED THE ABILITY AND REASONABLE OPPORTUNITY TO REUNIFY WITH H[ER] CHILDREN DUE TO THE PANDEMIC AND THE TIME FRAME TO COMPLETE H[ER] CASE PLAN AND REUNIFY SHOULD HAVE BEEN EXTENDED BY AN ADDITIONAL SIX MONTHS BEFORE PERMANENT

CUSTODY WAS CONSIDERED.

{¶36} In her first assignment of error, Mother argues she was denied a reasonable opportunity to reunify with the children due to the COVID-19 pandemic and contends the juvenile court should have granted her an additional six months to continue to make progress on her case plan before considering the Agency's motion for permanent custody. Mother argues that her "ability to visit her children and to complete [case plan] services was put on hold for over 6 months due to the global pandemic" and, citing health orders issued by the Governor of Ohio, tolling orders issued by the Ohio Supreme Court, and the federal eviction moratorium, argues that a similar delay in permanent custody proceedings should have applied.

{¶37} We note, however, that Mother never moved the juvenile court to extend temporary custody or continue the permanent custody proceedings on the grounds that the pandemic impeded her ability to reunify with the children. Instead, Mother asked for a continuance of the permanent custody hearing because she feared being exposed to COVID-19 while in the courtroom. Furthermore, when objecting to the magistrate's decision granting permanent custody to the Agency, Mother did not raise the issue of a sixth-month extension of the Agency's temporary custody in order to allow her additional time to complete case plan goals.

{¶38} It is well-settled that issues not raised in the trial court may not ordinarily be raised for the first time on appeal. *In re Moore*, 12th Dist. Preble No. CA291, 1981 Ohio App. LEXIS 14538, *12 (May 20, 1981); *In re T.S.*, 8th Dist. Cuyahoga No. 110015, 2021-Ohio-2034, ¶ 46. Where a party has failed to raise an issue in the trial court but subsequently raises it on appeal, an appellate court may consider the issue if it rises to the

level of plain error. *Id.* at ¶ 47, citing *Young v. Young*, 10th Dist. Franklin No. 11AP-114, 2011-Ohio-5060, ¶ 12. *See also* Juv.R. 40(D)(3)(b)(iv) (noting that "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless the party has objected to that finding or conclusion as required by Juv.R. 40[D][3][b]"). Plain error is found only in exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimately of the underlying judicial process itself. *In re K.M.*, 12th Dist. Butler Nos. CA2020-03-031 thru CA2020-03-033, 2020-Ohio-3602, ¶ 22, citing *In re J.F.*, 12th Dist. Butler No. CA2019-01-004, 2019-Ohio-3172, ¶ 14.

{¶39} Mother cannot establish any error, plain or otherwise, in the juvenile court's refusal to sua sponte grant a six-month continuance of the permanent custody proceedings. R.C. 2151.353(G) and 2151.415(D)(4) preclude a juvenile court from ordering that an existing temporary custody order continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier. The complaint was filed on January 17, 2019, and the children placed in the Agency's temporary custody on July 30, 2019. As such, the court could not grant a six-month continuance at the March 25, 2021 hearing as doing so would have brought the case outside the two-year timeframe set forth in R.C. 2151.353(G) and 2151.415(D)(4).

{¶40} Furthermore, the facts of the present case did not warrant a six-month extension. The record reveals that COVID-19 pandemic restrictions did not prevent Mother from accessing case plan services or otherwise preclude her from abstaining from drug use or other illegal activity, prevent her from attending online or telehealth services to address

her substance abuse and mental health issues, or stop her from attending virtual visitations with the children. Mother's failure to complete case plan services and reunify with Jo.M. and Ja.M. were based on Mother's actions, not the limitations presented by the COVID-19 pandemic.

{¶41} Prior to the COVID-19 pandemic, Mother failed to make progress on case plan objectives. The case plan was adopted by the juvenile court on March 6, 2019, a full year before the pandemic began in March 2020.[4] During this time, Mother was in and out of jail, failed to establish stable housing and employment, failed to routinely visit with the children, resulting in her visitations being suspended in May 2019 and October 2019, and continued to use illegal substances and test positive for methamphetamines, amphetamines, benzodiazepines, alcohol, or a combination of those substances. Mother also failed to regularly attend substance abuse and mental health treatments. Although Mother started treatment at Access Counseling in March 2019, she was unsuccessfully discharged from the program in May 2019. She did not reengage in services for more than a year, waiting until August 2020 to begin treatment at The Next Right Thing.

{¶42} Once the COVID-19 pandemic began and safety precautions were put into place, Mother was given the opportunity to continue case plan services remotely. She briefly reengaged in outpatient substance abuse and mental health treatment with The Next Right Thing in August 2020 by means of telehealth and virtual appointments. However, by the end of November 2020, Mother stopped attending counseling sessions and she was subsequently discharged from the facility. The Agency requested drug screens from Mother

---

4. The Governor of Ohio issued Executive Order 2020-01D declaring a state of emergency in Ohio in response to COVID-19 on March 9, 2020. A national emergency was declared by the President of the United States on March 13, 2020. *See In re L.H.*, 5th Dist. Guernsey No. 21CA000010, 2021-Ohio-2850, ¶ 38.

during the COVID-19 pandemic, and Mother refused to comply with the majority of those requests. Mother was given the opportunity to continue visitations with the children using video phone calls, but she frequently missed the visitations or cut short the visitations after failing to engage with the children. After Mother's visitation was suspended on December 12, 2020 by the juvenile court, she failed to satisfy the requisite conditions to have visitation reinstated.

{¶43} Though Mother complains that "many services were not available during the pandemic," the only service that Mother specifically identifies as being "not offered" during the pandemic was in-home parenting classes. However, as the Agency supervisor explained, the Agency did not refer the parenting classes in accordance with its policy that in-home parenting classes are not offered until the parent has obtained stable housing and made progress with drug treatment. As Mother had only recently moved into her townhouse and she had not progressed in her substance abuse treatment as of the date of the permanent custody hearing, it was Mother's lack of case progress, and not the pandemic, that prevented Mother from receiving a referral from the Agency for in-home parenting classes.

{¶44} The record therefore demonstrates that Mother's failure to complete case plan services was not the result of the limitations or restrictions presented by the COVID-19 pandemic but, rather, her own actions. As such, we find no merit to Mother's arguments that the juvenile court erred by not sua sponte ordering a six-month extension of temporary custody to allow her additional time to make progress on her case plan due to the COVID-19 pandemic. *See, e.g., In re C.R.,* 3d Dist. Seneca No. 13-20-21, 2021-Ohio-2640, ¶ 23 (finding no error in the denial of mother's request for a six-month continuance prior to the

permanent custody hearing where evidence established local drug recovery and mental health resources were offered throughout the pandemic yet mother failed to work towards case plan goals); *In re C.R.*, 6th Dist. Lucas No. L-20-1195, 2021-Ohio-1969, ¶ 41-42 (finding mother's argument that a six-month extension of temporary custody should have been granted due to the COVID-19 pandemic was a "red herring" as mother's mental health issues predated the pandemic, mother failed to address such issues prior to pandemic, and mother "fail[ed] to articulate how additional time would have made a difference concerning her mental health issues").  Mother's first assignment of error is, therefore, overruled.

{¶45}  Assignment of Error No. 2:

{¶46}  THE GRANT OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶47}  In her second assignment of error, Mother argues the juvenile court's decision awarding the Agency permanent custody of Jo.M. and Ja.M. is not supported by sufficient evidence and is against the manifest weight of the evidence.

{¶48}  Before a mother's constitutionally protected liberty interest in the care and custody of her children may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met.  *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982).  An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination.  *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6.  "This court will therefore reverse a juvenile court's decision to grant permanent custody only if

there is a sufficient conflict in the evidence presented." *In re L.S.*, 12th Dist. Brown Nos. CA2019-03-001 and CA2019-03-002, 2019-Ohio-3143, ¶ 17, citing *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. "However, even if the juvenile court's decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 15, quoting *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶49} In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15, citing *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25, citing *Eastley* at ¶ 21.

{¶50} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-

248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio- 3188, ¶ 12.

{¶51} In this case, the juvenile court found that Jo.M. and Ja.M. had been in the temporary custody of BCDJFS for at least 12 months of a consecutive 22-month period at the time the Agency moved for permanent custody on August 3, 2020. This finding is not disputed by Mother and is supported by the record, as the children have been in the temporary custody of the Agency since July 30, 2019.[5] Mother instead disputes the juvenile court's decision finding that permanent custody of the children to the Agency was in Jo.M.'s

---

5. The juvenile court also found that the children could not be placed with either parent within a reasonable time, which Mother disputes. We need not address this argument, however, because the children have been in the custody of the Agency for more than 12 months of a consecutive 22-month period, thereby establishing the second prong of the permanent custody analysis. *See In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 17, fn. 2.

- 19 -

and Ja.M.'s best interest. We find no merit to Mother's arguments.

{¶52} When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors. *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but are not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22, citing R.C. 2151.414(D)(1)(a) thru (e).

{¶53} Initially, with respect to the children's relevant interactions and relationships with those who may significantly impact their young lives, the juvenile court found that the children are doing well in their placement with the foster family. The court noted the children are bonded to their foster parents and their foster parents' biological children and the foster family has expressed an interest in adopting Jo.M. and Ja.M. While in the foster family's care, the children have had video calls with their maternal grandmother and an older sister, but the court found that "[t]he strength of any bond with [these] relatives [was] not able to be determined."

{¶54} As for the children's relationship with Mother, the court noted Mother had indicated she and the children were bonded. However, the court found that Mother had

- 20 -

difficulty maintaining visitation with the children throughout the pendency of the case, with her visitations being suspended on multiple occasions and the "quality of her visitation [being] inconsistent over time." The court discussed the difficulty Mother had in engaging the children during virtual visitations and found that "[t]owards the end of the visitations that took place, most of the observations of bonding [between Mother and the children] were noted as poor." Furthermore, "Mother's visitation has remained at the highest level of supervision throughout this case."

{¶55} In its consideration of R.C. 2151.414(D)(1)(b), the juvenile court noted that it had not conducted an in camera interview with Jo.M. and Ja.M., who were seven years old at the time of the permanent custody hearing. However, the court had considered the report of the children's guardian ad litem, who recommended that permanent custody be granted to the Agency.

{¶56} The court then considered the custodial history of the children, as required by R.C. 2151.414(D)(1)(c). The court noted that the children had been removed from Mother's custody for more than 26 months by the time of the permanent custody hearing. When removed from Mother's care on November 6, 2018, Jo.M. and Ja.M. were placed with nonrelative caregivers. The nonrelative caregivers were granted temporary custody of the children on January 17, 2019. Jo.M. and Ja.M. remained in the temporary custody of the nonrelative caregivers until July 30, 2019, when they were then placed in the Agency's temporary custody. At the time the Agency moved for permanent custody of the children, they had been in the Agency's custody for 12 months of a consecutive 22-month period. By the time of the permanent custody hearing, Jo.M. and Ja.M. had been in the Agency's temporary custody for 19 months.

{¶57} In considering R.C. 2151.414(D)(1)(d), the juvenile court found that the children were in need of legally secure placement and that their need for such placement could not be obtained without a grant of permanent custody to the Agency. The court discussed Mother's limited progress in meeting case plan services, her failure to address the substance abuse issues that initially led to the children's removal, and her continued involvement with her boyfriend, someone that the court determined "remain[ed] a significant source of concern." The juvenile court stated, in relevant part, that

> Mother has not successfully engaged in substance abuse and mental health services. * * * She has not complied with random drug screens. She has been transient for much of this case, and not held stable employment. Her visitations with the children were ultimately suspended, and she has failed to meet the criteria to have them reinstated due to lack of compliance with treatment. She continues to reside with her paramour who also has substance abuse issues, and he has refused to comply with treatment and screening.

{¶58} Furthermore, the court noted that more than two years after the children's removal from Mother's custody, "Mother continue[d] to lack insight into the reasons for the child[ren]'s removal or the importance of making changes to remedy the conditions for the removal."

{¶59} The juvenile court further stated that despite efforts by the Agency, no appropriate relatives or nonrelatives were found for placement of the children. The court noted that several home study assessments had been initiated but were "ultimately withdrawn after the families either failed to follow through or were withdrawn." No other appropriate relatives or nonrelatives had filed a motion for legal custody of the children as an alternative to the permanent custody motion.

{¶60} As it pertained to Mother, the court found that the factors set forth in R.C.

2151.414(E)(7) to (11) did not apply.[6]

{¶61} Based on its consideration of all relevant factors in accordance with R.C. 2151.414(D), the juvenile court found by clear and convincing evidence that it was in Jo.M.'s and Ja.M.'s best interest to grant permanent custody to the Agency.

{¶62} Mother disputes the juvenile court's findings and argues that the evidence does not support the grant of permanent custody. Mother asserts that she has made significant progress towards her case plan, "complet[ing] all case plan services except for one in home parenting class," and argues that the reasons the children were removed from her home are no longer an issue. Mother contends she is "clean and sober," employed full-time, and has a "two-bedroom home that is safe and appropriate" for the children.

{¶63} As an initial matter, we note that "the completion of case plan services alone does not equate to, or necessitate, a finding that the parents have substantially remedied the conditions that caused the removal of the child from the home." *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 24, citing *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. "[A] parent can successfully complete the requirements of a case plan, but not substantially remedy the conditions that caused the children to be removed, as the case plan is 'simply a means to a goal, but not the goal itself.'" *Id.*, quoting *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139 and CA2009-11-146, 2010-Ohio-1122, ¶ 30.

{¶64} However, in the present case, the record does not support Mother's contention that she has completed all but one case plan service. While Mother has made some progress towards her case plan goals, Mother has failed to address the substance

---

6. Father was found to have abandoned the children. R.C. 2151.414(E)(10).

abuse and mental health issues that led to the children's removal in November 2018. As of the date of the permanent custody hearing, Mother had not successfully completed a mental health or substance abuse treatment program. In fact, she had been unsuccessfully discharged from two treatment facilities and was merely in the process of reengaging one of those facilities for treatment. Though Mother had filled out paperwork at Access Counseling, she had not restarted treatment.

{¶65} Furthermore, while Mother passed two drug screens administered at the beginning of March 2021, Mother had not demonstrated her ability to remain sober for any significant period of time. Excluding the March 2021 negative screens, Mother's last negative screen for the Agency was in December 2019.

{¶66} Mother's failure to make progress on her substance abuse and mental health treatment prevented the Agency from making a referral for in-home parenting classes. Her failure to reengage in mental health and substance abuse treatment also prevented Mother from having her visitation reinstated after it was suspended by the court on December 17, 2020.

{¶67} Mother's housing and employment were also very new and did not demonstrate a period of stability. While Mother's housing had been deemed appropriate by the Agency, she had only resided in the home for approximately two months as of the date of the permanent custody hearing. Prior to that date, Mother spent different periods of time incarcerated, living with various family members, living at a campground, and living in a studio apartment. Mother also continued to reside with her longtime boyfriend, an individual who had been in and out of jail on various drug-related offenses. Mother admitted that her boyfriend struggled with drug abuse and was not engaged in treatment for his

substance abuse issues.

{¶68} As for her employment, Mother had started a new job only a few days before the permanent custody hearing. This job required Mother to work from 4:00 p.m. until 2:00 a.m. Mother did not have any real plans on how she would arrange for childcare during her work hours. She simply hoped that she would be able to change her shift.

{¶69} In addition to not making progress on the majority of her case plan goals, the record reflects that Mother does not recognize why the children were removed from her custody or the need for changes to her lifestyle in order to ensure the health, safety, and stability of the children. When asked about her personal habits and what in particular she would do differently if she regained custody of the children, Mother stated, "Umm…I don't, I don't really know because I don't know exactly what I have [done]." Mother did not see a problem with continuing to reside with her drug-using boyfriend. Despite acknowledging that she and her boyfriend went on "drug binges" together, where they not only used illegal substances but also committed crimes by writing "bad checks," Mother believed it would be appropriate to have the children around her boyfriend as her boyfriend was the only father figure Jo.M. and Ja.M. had ever known. Mother also thought it was appropriate, on her own accord, to stop taking the medication prescribed to her for her bipolar disorder, anxiety, and depression. Based on the evidence presented at the hearing, we agree with the juvenile court that Mother's statements and actions demonstrate her lack of insight and unwillingness to create a safe and stable environment for Jo.M. and Ja.M.

{¶70} In contrast, the record shows that the children have gained safety and stability while in the Agency's custody. Jo.M. and Ja.M. have been placed with the same foster family since the end of July 2019. By all accounts, the children are doing well in the

placement and are bonded to their foster family. The foster parents indicated a desire to adopt the children.

{¶71} As this court has previously recognized, "'[a] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.,* 2018-Ohio-3341 at ¶ 60, quoting *In re Keaton,* 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2014-Ohio-6210, ¶ 61. The juvenile court's decision does just that. Jo.M. and Ja.M. have been removed from Mother's care since November 6, 2018. Despite diligent and reasonable efforts by the Agency, Mother has been unable to remedy the conditions that caused the children's removal. The children are in need of legally secure permanent placement, and it is in their best interest for permanent custody to be awarded to the Agency. Therefore, in light of the foregoing considerations, we find that the juvenile court's decision to grant permanent custody of Jo.M. and Ja.M. to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's second assignment of error is overruled.

{¶72} Judgment affirmed.

PIPER, P.J., and M. POWELL, J., concur.