[Cite as *In re I.C.*, 2022-Ohio-3101.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY


| | | |
|---|---|---|
| IN RE: | : | |
| I.C., et al. | : | CASE NOS. CA2022-04-010 |
| | | CA2022-04-011 |
| | : | CA2022-04-012 |
| | : | O P I N I O N |
| | | 9/6/2022 |
| | : | |
| | : | |


APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 20193015, 20193016, and 20193017


Holly M. Simpson, for appellant.

Andrew T. McCoy, Clinton County Prosecuting Attorney, and Danielle E. Sollars, Assistant Prosecuting Attorney, for appellee.


**HENDRICKSON, J.**

{¶1} Appellant, the biological mother of I.C., S.G., and J.G. ("Mother"), appeals from a decision of the Clinton County Court of Common Pleas, Juvenile Division, granting permanent custody of her children to appellee, Clinton County Children Services ("the Agency"). For the reasons discussed below, we affirm the juvenile court's decision.

{¶2}   S.G., born February 12, 2016, and I.C., born April 19, 2018, resided with Mother until being removed from her care on April 18, 2019.[1]  Around this time, the Agency was notified by Dayton Children's Hospital that Mother had taken the children to the hospital after I.C. had fallen ill.  Mother had admitted to hospital staff that she had relapsed on methamphetamine and the hospital staff was concerned about Mother's mental state.  Furthermore, after I.C. was admitted for treatment, Mother became unreachable.

{¶3}   As a result, on April 18, 2019, the Agency filed a complaint alleging that S.G. and I.C. were abused, neglected, and dependent children.  The juvenile court held an emergency hearing and ordered that temporary custody of the children be granted to the children's paternal grandmother but that the Agency have protective supervision.  The Agency was given discretion over Mother's visitation with the children.  A guardian ad litem was appointed for the children.

{¶4}   On May 30, 2019, Mother stipulated to a finding of dependency and the allegations of abuse and neglect were dismissed.  The juvenile court continued the order of temporary custody to paternal grandmother under the Agency's protective supervision.  On July 16, 2019, the court adopted a case plan for Mother's reunification with the children.  The case plan required Mother to complete a mental health assessment and any recommended treatment, complete an alcohol and drug assessment and any recommended treatment, submit to random drug screens, complete parenting classes, and obtain and maintain employment and suitable housing.

{¶5}   Over time, Mother and paternal grandmother's relationship deteriorated and

---

1. S.G. and I.C. share a biological father.  S.G. and I.C.'s father did not participate in any case plan services and did not appear at the permanent custody hearing.  He was found to have abandoned the children and is not a party to the present appeal.

began to interfere with Mother's visitations with the children. On August 20, 2019, the juvenile court ordered S.G. and I.C. returned to Mother's custody under the protective supervision of the Agency. Paternal grandmother was ordered not to have any contact with Mother or the children. The juvenile court granted six-month extensions of the Agency's protective supervision over the children on May 13, 2020 and December 10, 2020.

{¶6} On April 19, 2020, Mother had a third child, J.G. J.G. resided with Mother and his half-siblings until February 9, 2021.[2] On that date, an emergency hearing was conducted after the Agency learned that Mother had been evicted from her apartment, did not have stable housing, and started to use methamphetamine again. The juvenile court removed all three children from Mother's care and placed them in the temporary custody of the Agency.

{¶7} Referencing Mother's eviction and her recent use of methamphetamine, the Agency filed a complaint on February 12, 2021 alleging that J.G. was a dependent child. On March 31, 2021, J.G. was adjudicated dependent and the court continued the Agency's temporary custody of the child. The juvenile court appointed S.G.'s and I.C.'s guardian ad litem to serve as J.G.'s guardian ad litem.

{¶8} On April 26, 2021, following a dispositional hearing, the juvenile court approved J.G. being added to Mother's existing case plan for reunification. The court found that it was in J.G.'s best interest for the Agency to continue temporary custody of the child. The court ordered that Mother's visitation with J.G., like with S.G. and I.C., would be left to the discretion of the Agency.

---

2. J.G. has a different father than his siblings. J.G.'s father did not play an active role in J.G.'s life. J.G.'s father declined to be added to the case plan for reunification, indicated to the Agency that he was unable to care for his child, and did not appear at the permanent custody hearing. J.G.'s father was found to have abandoned J.G. and he is not a party to the present appeal.

{¶9} The Agency worked with Mother to set up visitations with the children. However, Mother consistently missed visitations, oftentimes failing to appear even though she had confirmed she would be there. On August 10, 2021, the court suspended Mother's visitations, stating "[M]other is not complying with the case plan and has not visited the children since March of 2021. On request of the guardian ad litem, and for good cause shown, the Court ORDERS the [M]other is to have no visits pending further order."

{¶10} Thereafter, on August 30, 2021, the Agency moved to modify its temporary custody of the children to permanent custody. The Agency alleged that Mother and the children's fathers had abandoned the children and that permanent custody was in the children's best interest given Mother's lack of progress on the case plan. The Agency noted that Mother did not have stable housing or employment, was not engaged in treatment consistently, and had not visited or spoken with the children since March 17, 2021.

{¶11} After the Agency moved for permanent custody, Mother filed motions to reestablish her visitation with the children. A motion for visitation was filed in J.G.'s case on September 15, 2021 and in S.G.'s and I.C.'s cases on September 30, 2021.

{¶12} A hearing on Mother's motions to reestablish visitation and on the Agency's motion for permanent custody was scheduled for December 21, 2021. A week before the scheduled hearing, on December 14, 2021, the children's guardian ad litem filed a report stating that a grant of permanent custody to the Agency was in the children's best interest. In recommending that permanent custody be granted, the guardian ad litem noted the lack of bond between the children and their birth parents, Mother's failure to visit the children since March 17, 2017, Mother's lack of progress on her case plan, and Mother's continued drug use.

{¶13} The day of the permanent custody hearing, Mother's counsel moved for a

continuance due to health concerns involving Mother. The court granted a continuance and the permanent custody hearing was rescheduled for January 18, 2022. On this date, the court heard testimony from Gina May, the supervisor who oversaw the children's case with the Agency, and from Mother. Though the guardian ad litem was present at the hearing, the parties expressly declined the court's invitation to cross-examine her about her December 14, 2021 report recommending that permanent custody be granted to the Agency.

{¶14} May testified that though there have been four different caseworkers assigned to Mother's case since its inception in April 2019, she has always been the supervisor over the case. As a result, May is familiar with Mother's history with the Agency, Mother's goals for reunification with the children, and Mother's limited progress in achieving case plan objectives. Regarding Mother's history with the Agency, May testified the Agency first became involved on April 18, 2019, after Mother took I.C. and S.G. to Children's Hospital for treatment and Mother exhibited signs of drug use and a distressed mental state. The children were removed from Mother's custody and placed in the temporary custody of their paternal grandmother, with the Agency being granted protective supervision over the children. Though I.C. and S.G. were returned to Mother's custody on August 20, 2019, the Agency retained protective supervision. The Agency's protective supervision continued until February 9, 2021, at which time I.C. and S.G., almost three and five years old respectively, were placed in the Agency's temporary custody. Mother's third child, J.G., who was nine months old at the time, was placed in the Agency's temporary custody on this date as well. Mother had been evicted from her apartment, started using methamphetamine again, and was unable to care for the children. On August 30, 2021, the Agency moved for permanent custody of the children after Mother failed to have contact with the children,

make progress on her case plan, or remedy the conditions that led to their removal.

{¶15} Regarding the case plan requirements, May noted Mother was to complete a mental health assessment and any recommended treatment, complete an alcohol and drug assessment and any recommended treatment, submit to random drug screens, complete parenting classes, and obtain stable income and housing. May testified Mother obtained a mental health assessment at Beckett Springs and was diagnosed with Bipolar I and opiate addiction issues. Mother had received some mental health services at BrightView, but her attendance was irregular. As of November 2021, Mother's attendance was only around 60 percent, which BrightView found insufficient for effective treatment. BrightView attempted to provide the Agency with an updated report on Mother's attendance on January 5, 2022, but the electronic report could not be opened by the Agency. Despite the Agency's efforts to follow up with BrightView about the January 2022 report, the Agency was unable to obtain any updated information.

{¶16} Mother completed an alcohol and drug assessment and was ordered to complete a drug and alcohol treatment program as well as demonstrate sobriety by testing negative on drug screens. As of the date of the permanent custody hearing, Mother had not completed a drug or alcohol program, though she was receiving some treatment services at BrightView. On multiple occasions throughout the history of Mother's case with the Agency, Mother admitted to using methamphetamine. She also tested positive on a number of drug screens administered by the Agency and by BrightView. For instance, in February 2021, Mother tested positive for methamphetamine and amphetamine. Since March 2021, Mother has tested positive for Gabapentin, a drug prescribed to people who are in pain. Though Mother did not have a prescription for Gabapentin, Mother continued to test positive for the drug as late as August 25, 2021 and November 5, 2021.

**{¶17}** May explained that though Mother had completed a parenting class in 2019, Mother had failed to demonstrate the skills taught in the class. May testified Mother had not shown the ability to meet the needs of her children or an ability to complete simple daily tasks like getting the children up and preparing them for school. May explained that I.C. has autism and is a high-needs child. I.C. receives multiple services, including occupational therapy, speech therapy, and feeding therapy. J.G. had begun exhibiting signs of developmental delay and had been recommended for testing. The Agency had concerns about Mother's ability to transport the children to and from the various medical appointments and her ability to follow through with the treatments and recommendations derived from those appointments. May noted that Mother had not participated in any of the children's medical testing or services since the Agency gained temporary custody of the children in February 2021.

**{¶18}** May also noted that Mother was unreliable and inconsistent in visiting with the children. Over an eight-month period, 17 visitations were scheduled and offered to Mother. Mother only attended one of those visitations – a March 17, 2021 visitation which was held via Zoom. This was the date of Mother's last visitation or contact with the children. On at least eight other occasions, Mother confirmed that she would attend the visitation but then failed to show up. May explained that Mother's failure to appear had a negative effect on the children's well-being and caused them distress. S.G., for instance, regressed and started wetting her pants. Eventually, in August 2021, the court suspended visitations.

**{¶19}** May testified that the Agency had not received any information or records from Mother indicating that she was gainfully employed or had a steady income. May also testified Mother has not had stable housing since at least December 2020, when she was evicted from her former apartment. Mother sometimes stayed at a hotel or with I.C. and

S.G.'s paternal grandmother's ex-girlfriend. The Agency had not been able to verify Mother's whereabouts for more than six months by the time of the permanent custody hearing. Shortly before the hearing commenced, Mother advised May she was once again staying with paternal grandmother's ex-girlfriend. May expressed concern over Mother's living arrangements, noting that paternal grandmother's ex-girlfriend had previously tested positive for methamphetamine and had appeared in a number of police reports regarding domestic violence incidents involving herself and paternal grandmother.

{¶20} May testified that the children were in need of legally secure placement and that could not occur without a grant of permanent custody. She noted that the children had made great progress since being removed from Mother's care and placed in their foster home. Their foster care placement gave them stability, something Mother was never able to do. May further testified that the Agency did not believe the circumstances of the case warranted granting Mother additional time to pursue reunification. May noted Mother had over two years to complete many of the case plan requirements and had made limited progress on achieving those goals. May testified Mother continued to "do things that are not in the best interest of her children."

{¶21} Mother testified that she has made some progress on her case plan. Although she has not completed a drug and alcohol program, she testified she is receiving treatment for her addictions and her mental health. Mother testified she was attending NA and AA meetings three times per week via Zoom and attending an in-person therapy session with her counselor once a week at BrightView. Mother admitted that with respect to her treatment, she "believe[s] [she] could do a lot better," but that it was "kind of hard for [her] to get things done on [her] own."

{¶22} Mother testified that she is currently taking Zoloft and Suboxone, as those

drugs had been prescribed to her. When questioned about her use of Gabapentin, Mother admitted that she had been prescribed Gabapentin "years ago." She explained that she had recently taken the drug as it "kind of helps" her by calming her down.

{¶23} Mother testified about her current living arrangement, stating that she is staying with I.C. and S.G.'s paternal grandmother's ex-girlfriend. However, she claimed that she has looked into getting housing assistance and is waiting to hear back from Metropolitan Housing Authority. Mother also testified she had not had a job since February 2021, but had recently found employment. She indicated she would be starting work at Family Dollar the day after the permanent custody hearing was held.

{¶24} Mother acknowledged that she had not been in regular contact with the Agency throughout the pendency of her case but claimed it was because she did not know who had been assigned as her caseworker. She also acknowledged that she had only visited her children once in the last year, and that occurred in March 2021 via Zoom. Nonetheless, Mother testified she was asking for "one last chance to make it right and prove to [her] kids that they do have a mom that actually gives a damn about – and who loves them * * * and care[s] for them."

{¶25} After hearing the foregoing testimony, the juvenile court took the matter under advisement and permitted the parties to file written closing arguments. On March 15, 2022, the court issued its decision denying Mother's motions to reinstate visitation with the children and granting the Agency's motion for permanent custody of I.C., S.G., and J.G. The court found that the children had been abandoned by Mother and their respective fathers and that it was in their best interest for permanent custody to be awarded to the Agency. The court further found that the children's parents had "failed to remedy the problems that caused the children to be placed in the custody of [the Agency] despite

reasonable case planning and diligent efforts by the [A]gency to assist them."

{¶26} Mother appealed the juvenile court's decision, raising two assignments of error for review.

{¶27} Assignment of Error No. 1:

{¶28} THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY WHEN IT THE STATE [SIC] DID NOT MEET ITS BURDEN TO SHOW THAT AN AWARD OF PERMANENT CUSTODY WAS APPROPRIATE.

{¶29} In her first assignment of error, Mother argues that the juvenile court's decision awarding the Agency permanent custody of I.C., S.G., and J.G. is not supported by sufficient evidence and is against the manifest weight of the evidence.

{¶30} Before a parent's constitutionally protected liberty interest in the care and custody of his or her children may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. "This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented." *In re L.S.*, 12th Dist. Brown Nos. CA2019-03-001 and CA2019-03-002, 2019-Ohio-3143, ¶ 17, citing *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. "However, even if the juvenile court's decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re C.S.*, 12th Dist.

Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 15, quoting *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶31} In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15, citing *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25.

{¶32} Pursuant to R.C. 2151.414(B)(1), a juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9; *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 18. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary

custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio- 3188, ¶ 12.

{¶33} Mother disputes the juvenile court's finding, under R.C. 2151.414(B)(1)(b), that she abandoned the children. Mother argues she did not abandon the children as she "cared for the children for a significant portion of the time th[e] case had been ongoing" and she sought to resume visitation with the children after the court suspended her visitations.

{¶34} A child is "presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C). Here, the Agency's supervisor testified and the juvenile court found that Mother's last visitation or contact with the children was on March 17, 2021. After that date, Mother consistently failed to appear for her visitations and they were subsequently suspended by the juvenile court on August 10, 2021. By the time the Agency moved for permanent custody, Mother had not seen or had contact with the children for more than five months. The fact that she filed motions seeking to reestablish visitations in September 2021 is of little consequence, as the motion was filed well after 90 days had passed since the date of her last visit or contact with the children. The record, therefore, supports the juvenile court's conclusion that Mother abandoned I.C., S.G., and J.G.

**{¶35}** Mother argues that even if she had abandoned the children, the juvenile court "was not required to grant permanent custody based on abandonment." Mother asserts that the progress she had made towards her case plan as well as the best interest considerations set forth in R.C. 2151.414(D) weigh against permanent custody being granted to the Agency.

**{¶36}** When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors. *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but are not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22, citing R.C. 2151.414(D)(1)(a) thru (e). The factors in R.C. 2151.414(E)(7) through (11) involve a parent's having been convicted of or pled guilty to specific criminal offenses against the child, the child's sibling, or another child who lived in the parent's household; a parent's withholding of medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. *In re A.M.*, 2020-Ohio-5102 at ¶ 19.

**{¶37}** The record reflects that the court considered the best interest factors set forth

in R.C. 2141.414(D).  In considering these factors, the court noted, in pertinent part, that the children did not have a relationship with their biological fathers and had not seen or had contact with Mother in almost a year – since March 17, 2021.  The court discussed Mother's "lack of motivation or commitment" to the children, which the court found was "demonstrated by [her] failure to make any significant progress on the case plan, and [her] apparent disinterest in having any contact with the children."  The court noted Mother "regularly failed to communicate or visit with the children," had "not completed the elements of the case plan," and had "failed to remedy the problems that caused the children to be placed in the custody of [the Agency] despite reasonable case planning and diligent efforts by the [A]gency to assist [her]."  The court found that legally secure placement could not be assured without a grant of permanent custody to the Agency.  The court further noted that although the children were too young to express their wishes to the court directly, their guardian ad litem had recommended granting permanent custody to the Agency.

{¶38}  Mother acknowledges the court considered the best interest factors set forth in R.C. 2151.414(D) before awarding permanent custody of the children to the Agency but contends that the decision is not supported by the weight of the evidence.  She challenges the court's findings about her relationship with the children, noting that "as recently as six months before the [m]otion for [p]ermanent [c]ustody was filed" she had custody of the children and she had sought to have her visits with the children reinstated in September 2021.  She also argued that she had made "at least some progress on all elements of the case plan, and more significant progress on others," which she contends weighed against the court's decision to grant permanent custody.

{¶39}  As an initial matter, we note that "the completion of case plan services alone does not equate to, or necessitate, a finding that the parents have substantially remedied

the conditions that caused the removal of the child from the home." *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 24, citing *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. "[A] parent can successfully complete the requirements of a case plan, but not substantially remedy the conditions that caused the children to be removed, as the case plan is 'simply a means to a goal, but not the goal itself.'" *Id.*, quoting *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139 and CA2009-11-146, 2010-Ohio-1122, ¶ 30.

{¶40} In the present case, the only case plan requirement Mother completed was attending parenting classes in 2019. Though she has made some progress towards other case plan goals, Mother has failed to address the substance abuse and housing issues that led to the children's removal in February 2021. As of the date of the permanent custody hearing, Mother had not successfully completed a substance abuse or mental health treatment program. As of November 2021, her attendance at BrightView was around 60 percent. Though Mother claimed that she had gotten more regular in her attendance and participation, claiming to participate in NA and AA meetings three times a week and attending an in-person therapy session weekly, Mother had not demonstrated a commitment to staying sober or drug free. Mother had relapsed on methamphetamine a number of times and, as of early November 2021, she continued to use Gabapentin, a drug of abuse. Mother admitted she had last been prescribed Gabapentin "years ago," but had started self-medicating and using the drug to calm herself. Mother's continued use of narcotics and her failure to complete a substance abuse treatment program is especially concerning given that this has been a case plan goal that has existed since mid-2019, when the Agency first became involved.

{¶41} Mother also had not demonstrated stable housing or income. Since being

evicted from her apartment in December 2020, Mother has failed to find a suitable housing. She stayed in hotels or at I.C.'s and S.G.'s paternal grandmother's ex-girlfriend's home. As of the date of the permanent custody hearing, Mother was back living with paternal grandmother's ex-girlfriend. As May explained, the Agency had concerns about the appropriateness of this residence given that paternal grandmother's ex-girlfriend had previously tested positive for methamphetamine and had appeared in numerous police reports detailing domestic violence incidents between herself and paternal grandmother. Though Mother testified she had looked into getting housing assistance, there was no indication as to when or if Mother would be able to obtain a residence suitable for herself and the children.

{¶42} As for her employment, Mother indicated she had not been working for nearly a year. Mother claimed she had obtained a job with Family Dollar and was set to start her first day of work the day after the permanent custody hearing. Mother did not indicate whether she would be working fulltime or parttime, the hours she would be working, or how she would arrange or pay for childcare if she were to obtain custody of the children.

{¶43} Though Mother challenges the court's finding that she lacked a relationship with her children, there is evidence in the record supporting the juvenile court's determination. After losing custody of the children in February 2021, Mother had one contact with the children – a Zoom visit that occurred on March 17, 2021. After that date, she failed to appear for scheduled visitations or to contact the Agency to inquire into the children's well-being or follow up on their medical appointments. Mother's failure to appear for visitations had a negative effect on the children, especially S.G., who began regressing in her behavior and started wetting herself. The court suspended Mother's visitations on August 10, 2021, and Mother did not file a motion seeking to have her visitations reinstated

until September 2021, after the Agency moved for permanent custody.

{¶44} Though Mother expressed a desire for "another chance" to parent the children, her failure to make progress on the case plan, to remedy the conditions that led to the children's removal, and to visit or maintain contact with the children demonstrate her lack of motivation and commitment to the children. Mother has not shown that she can meet the needs of the children or provide them with the stability they need. In contrast, the record shows that the children have gained the safety and stability they need since being placed in the Agency's custody. The children are doing well in their foster placement and I.C.'s and J.G.'s special needs are being met through various testing and therapy appointments.

{¶45} As this court has previously recognized, "'[a] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 2018-Ohio-3341 at ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2014-Ohio-6210, ¶ 61. The juvenile court's decision does just that. Mother abandoned the children, having had no contact with them since March 17, 2021. They have been in the Agency's temporary custody since February 9, 2021, and despite diligent and reasonable efforts by the Agency, Mother has been unable to remedy the conditions that caused the children's removal. The children are in need of legally secure permanent placement, and it is in their best interest for permanent custody to be awarded to the Agency. Therefore, in light of the foregoing considerations, we find the juvenile court's decision to grant permanent custody of S.G., I.C., and J.G. to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's first assignment of error is overruled.

{¶46} Assignment of Error No. 2:

**{¶47}** THE TRIAL COURT ERRED IN NOT EXTENDING THE TEMPORARY CUSTODY ORDERS TO GIVE APPELLANT TIME TO COMPLETE THE CASE PLAN PURSUANT TO O.R.C. 2151.415.

**{¶48}** In her second assignment of error, Mother contends the juvenile court rushed to grant the Agency permanent custody of the children. Rather than granting permanent custody, Mother contends the court should have granted an extension of the Agency's temporary custody under R.C. 2151.415 in order to allow her to make further progress on her case plan for reunification.

**{¶49}** We note that Mother did not file a motion seeking an extension of the Agency's temporary custody prior to the permanent custody hearing. Nonetheless, at the permanent custody hearing and in her written closing arguments, Mother requested the court extend the Agency's temporary custody in order to allow her additional time to meet case plan objectives. The juvenile court necessarily rejected this request when it granted the Agency's motion for permanent custody.

**{¶50}** Pursuant to R.C. 2151.415(D) and Juv.R. 14, a juvenile court may extend a temporary custody order for a period of six months if it determines, by clear and convincing evidence, that the extension (1) is in the best interest of the child, (2) there has been significant progress on the case plan of the child, and (3) there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension. *See In re T.W.*, 12th Dist. Warren No. CA2017-06-079, 2017-Ohio-8268, ¶ 24. "'Notably the [extension] statute provides only that the juvenile court may extend the temporary custody order, not that it *must* do so.'" (Emphasis sic.) *Id.* at ¶ 25, quoting *In re H.G.*, 12th Dist. Clinton No. CA2014-11-014, 2015-Ohio-1764, ¶ 20. A juvenile court's decision to grant or deny a request for an extension of temporary custody

is therefore reviewed under an abuse-of-discretion standard.  *Id.*  An abuse of discretion is more than an error of law or judgment; it implies the attitude of the court was unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶51}**  With respect to I.C. and S.G., an additional extension of temporary custody was not permitted pursuant to R.C. 2151.353(G) and 2151.415(D)(4).  Both statutes preclude a juvenile court from ordering that an existing temporary custody order continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier.  *See In re D.S.*, 12th Dist. Clinton Nos. CA2021-10-030 and CA2021-10-031, 2022-Ohio-998, ¶ 73; *In re J.M.*, 12th Dist. Butler Nos. CA2021-06-072, CA2021-06-073, CA2021-07-083, and CA2021-07-084, 2021-Ohio-3961, ¶ 39.  As an abuse, neglect, and dependency complaint was filed in S.G.'s and I.C.'s cases on April 18, 2019, the court could not order an extension of temporary custody in their cases.

**{¶52}**  As for J.G., the evidence presented at the permanent custody hearing failed to demonstrate that Mother made significant progress on the case plan.  Mother lacked stable income and housing, continued to use narcotics and test positive on drug tests, and failed to complete a substance abuse program.  Many of the obstacles that led to the Agency's initial involvement in April 2019 and its subsequent involvement in February 2021 still existed in January 2022.

**{¶53}**  "[A] juvenile court is not required to prolong the custody proceedings for a parent to begin to cooperate in the case planning process."  *In re May*, 6th Dist. Lucas Nos. L-19-1030 and L-19-1039, 2019-Ohio-3601, ¶ 30.  This is especially true where the evidence introduced at the permanent custody hearing demonstrated that it was in the children's best interest for permanent custody to be granted.  Accordingly, as Mother had not made significant progress on the reunification requirements of the case plan and

because it was in the best interest of the children for permanent custody to be granted to the Agency, we find that the juvenile court did not err in denying Mother's request for an extension of temporary custody as it related to I.C., S.G., or J.G. Mother's second assignment of error is overruled.

**{¶54}** Judgment affirmed.

M. POWELL, P.J., and BYRNE, J., concur.