[Cite as *In re J.M.*, 2025-Ohio-1406.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


IN RE:                                          :

    J.M.                                      :           CASE NO. CA2025-01-008

                                   :           O P I N I O N
                                                   4/21/2025

                                   :

                                   :

                                   :


APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2022JC05506


Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas Horton, Assistant Prosecuting Attorney, for appellee.

Christopher Bazeley, for appellant.



**HENDRICKSON, P.J.**

{¶ 1} Appellant, the biological father of J.M., appeals a decision of the Clermont County Court of Common Pleas, Juvenile Division, granting permanent custody of his son to appellee, the Clermont County Department of Job and Family Services ("the Agency"). For the reasons discussed below, we affirm the juvenile court's decision.

{¶ 2}   J.M. was born on March 15, 2017, and Father's paternity was subsequently established. J.M. resided with Father.[1]

{¶ 3}   On June 24, 2022, the Agency filed a complaint alleging that J.M. was a neglected child. The complaint indicated that on June 1, 2022, J.M., then five years old, had been found wandering around a construction area by himself for 30 to 45 minutes. Father was contacted and appeared to be under the influence. Father consented to a drug screen, which came back positive for several different illegal substances, including cocaine, methamphetamine, and fentanyl. The Agency tried to make contact with Father in the weeks following the June 1st incident, however Father was unable to be reached. On June 23, 2022, the Agency made contact with Father at his home. Father engaged in erratic and disorderly behavior and law enforcement were called to the scene. The Agency removed J.M. from Father's home at that time. The following day, June 24, 2022, the Agency was granted emergency custody of J.M., and the juvenile court appointed a guardian ad litem for the child.

{¶ 4}   On August 18, 2022 the court held an adjudicatory hearing. The next day, following admissions made by Father, J.M. was adjudicated a dependent child. A dispositional hearing was held on September 15, 2022. In both instances, the juvenile court continued the order of temporary custody with the Agency. Father was granted weekly visitation with J.M. at the Agency's visitation center, which he routinely exercised until May 2023. Due to lack of attendance, Father was officially removed from the visitation list in the fall of 2023. Multiple months passed before he re-engaged in visitation

---

1. Mother is not involved in J.M.'s life. She was served with notice of the juvenile court proceedings by posting. She did not appear or participate in the juvenile court proceedings and was found to have abandoned J.M. She is not a party to the present appeal.

with J.M.[2]

{¶ 5} The Agency created a case plan for Father's reunification with the child, and this plan was adopted by the juvenile court. The case plan required Father complete a substance abuse assessment and follow through with all recommended treatments, obtain and maintain stable housing and income, complete parenting education classes, and engage in case management services with the Agency. Though Father began working on case plan objectives by undergoing a drug assessment with the Clermont Recovery Center ("CRC") and starting intensive outpatient services, he was ultimately unsuccessfully discharged from the program on May 11, 2023 due to chronic absenteeism. Father attempted treatment again later that month at CAT House, but left after 20 days. He did not seek any further treatment until April 12, 2024, when he sought to re-engage in services with CRC. Though it was recommended that Father engage in intensive inpatient program, Father declined this course of treatment. Instead, Father engaged in outpatient services. However, he was once again removed from services on May 30, 2024.

{¶ 6} The Agency requested and was granted an extension of temporary custody on August 3, 2023. On September 7, 2023, following limited progress on the case plan by Father, the Agency filed a motion for permanent custody of J.M. Five days later, September 12, 2023, Father filed a motion for custody. A hearing on the competing motions was scheduled for January 12, 2024. A week prior to that date, on January 5,

---

2. There is conflicting information in the record regarding the exact date Father's visitations were cancelled and then later resumed. The Agency caseworker testified Father's last visit occurred in May 2023, and he was taken off the visitation log in August 2023, with visitation being restarted on March 8, 2024. The guardian ad litem's report, however, indicates Father's visitations were terminated on September 27, 2023 and reinstated after January 12, 2024. The juvenile court, adopting the magistrate's factual findings, found that Father did not visit J.M. between May 2023 and March 8, 2024. Assuming Father maintained visitation with J.M. until the last day of May 2023, the 31st, more than nine months passed without a visit. Using the dates the guardian ad litem provided, more than three months (or 107 days) passed.

2024, the guardian ad litem filed a report recommending permanent custody be granted to the Agency.

**{¶ 7}** The day the hearing was set to commence, Father moved for a continuance, which was granted by the juvenile court. A new hearing date was set for March 8, 2024. However, prior to this date, Father again moved for a continuance, citing his desire to continue to work on case plan objectives and the expected filing of a motion for legal custody by J.M.'s paternal aunt ("Paternal Aunt"). On March 7, 2024, Paternal Aunt filed a motion to intervene in the case and attached to her filing a motion for legal custody of J.M. The juvenile court granted a continuance until May 31, 2024, noting that Paternal Aunt's motion to intervene would be addressed at the outset of the May 31st hearing.

**{¶ 8}** On May 28, 2024, the guardian ad litem filed an addendum to her previously filed report, once again recommending that permanent custody be granted to the Agency. A hearing before a magistrate commenced on May 31, 2024. At the time of the hearing, J.M. was seven years old.

**{¶ 9}** Paternal Aunt testified on behalf of her desire to intervene in the case and be granted legal custody of J.M. Paternal Aunt indicated that she had cared for J.M. for about three weeks when he was around six months old. She also occasionally cared for J.M. when Father had to go to work. Other than occasionally caring for J.M. and seeing him at holiday gatherings or at family birthday parties, Paternal Aunt recalled that there had been one occasion when she took J.M. on a week-long vacation to Tennessee. Paternal Aunt explained that she had waited until March 7, 2024 to file her motion to intervene and seek custody of J.M. because she believed Father would be able to regain custody. Paternal Aunt testified she was taking classes to become a certified foster parent.

{¶ 10} Following Paternal Aunt's testimony, the magistrate denied Paternal Aunt's motion to intervene and dismissed, without prejudice, her motion for legal custody. The magistrate found that Paternal Aunt never stood in loco parentis to the child and did not have a legally protected interest in the proceedings.[3] The magistrate then proceeded to hear evidence relating to the Agency's motion for permanent custody and Father's motion for custody. The Agency presented testimony from a staff attorney for the Clermont County Child Support Enforcement Agency (CSEA), the Agency caseworker assigned to J.M.'s case, J.M.'s foster mother, and an adoption supervisor for the Agency.

{¶ 11} The CSEA staff attorney testified that in 2022, the Agency filed a complaint for child support against Father. Pursuant to a December 2022 order, Father was obligated to pay $115.52 in support each month, plus an additional $16.85 as cash medical and $26.47 in arrearages, for a total monthly obligation of $162.02. Since Father's support obligation had been determined, Father had only made three payments. Of those three payments, only an August 2023 payment had been voluntarily made. In November 2023, CSEA had intercepted $960 in lottery winnings. Then, in December 2023, CSEA obtained an involuntary assignment of $1,105.[4] At the time of the permanent custody hearing, Father had an arrearage of $713.24.

{¶ 12} The Agency caseworker assigned to J.M.'s case testified about the Agency's involvement, J.M.'s placement history, and Father's limited progress on the case plan. The caseworker explained that J.M. was initially removed from Father's home on June 23, 2022 and the Agency was granted emergency temporary custody on June 24, 2022. J.M. has remained in the Agency's temporary custody since that date. J.M. has had

---

3. The juvenile court later adopted the magistrate's decision denying Paternal Aunt's motion to intervene and dismissing her motion for custody without prejudice.

4. As the magistrate noted in its July 2, 2024 decision, the source of the $1,105 was not testified to by the CSEA Agent, but the record indicates the funds were not from Father's employment.

four different foster placements. He was placed in his current foster home in August 2023. According to the caseworker, J.M. is doing "great" in his foster placement and he has "excelled tremendously" in his schooling while there. J.M. was set to receive reading and literacy tutoring during the summer of 2024 and was enrolled in speech therapy. The caseworker noted that J.M.'s foster parents were "very consistent with [J.M.'s] speech, his schooling." The caseworker stated that foster parents have "given [J.M.] a lot of structure. . . which he desperately needed" and foster parents were interested in providing a permanent home for the child.

{¶ 13} The caseworker testified that J.M. and Father have a "good relationship" and that J.M. "speaks positively" of Father. The caseworker noted that Father is very attentive to J.M. during visits and the two share a "strong bond." Father was initially very consistent in exercising his visitation with J.M. However, in May 2023, Father began missing multiple visits, purportedly due to illness and car trouble. Father missed so many visits that he was taken off the visitation log in August 2023. According to the caseworker, Father did not have any visits with J.M. from May 2023 to March 8, 2024, when visitations were restarted. Recently, Paternal Aunt started visitations with J.M., and those visits were going fine.

{¶ 14} With respect to Father's case plan progress, the caseworker testified that Father had suitable housing and income. Father had been residing in the same home for the pendency of the case and this home had a safe and appropriate room set up for J.M. Father purportedly worked as a painter, though there was no evidence presented as to his salary.

{¶ 15} The caseworker testified Father failed to make progress addressing his substance abuse issues, which the caseworker indicated was the "most significant" component of his case plan. Though the Agency had explained to Father that his drug

use was a barrier to Father reunifying with J.M., Father continued to use drugs and made no measurable progress in treatment.

{¶ 16} On August 18, 2022, Father completed a substance abuse assessment at CRC. It was recommended that Father engage in intensive outpatient services, including individual and group therapies and medication-assisted treatment. Though Father initially engaged in services, his attendance was poor. On March 30, 2023, CRC sent a "no contact" letter. Father was ultimately discharged from CRC on May 11, 2023. After being discharged from CRC, Father briefly engaged in services at CAT House. In May 2023, he spent approximately 20 days in an inpatient drug treatment program before choosing to leave the program. He did not re-engage in any services until April 12, 2024, approximately seven months after the Agency moved for permanent custody. Though Father refused a toxicology screen, he did obtain a new assessment from CRC. CRC recommended inpatient services, but Father rejected that course of treatment. Instead, Father agreed to intensive outpatient services, which included individual and group therapies that met three times per week. Father was removed from CRC services on May 30, 2024, the day before the permanent custody hearing. The caseworker testified there had been "no measurable outcome in treatment" as Father had not attended enough sessions. When Father was last drug tested by the Agency on March 8, 2024, he tested positive for opiates, including heroin metabolite, morphine, and fentanyl.

{¶ 17} Father's lack of progress on treating his substance abuse issues prevented the Agency from referring him to a parenting education course. The caseworker explained that it was the Agency's policy to wait to recommend a 15-week parenting program through Child Focus until the Agency saw consistent substance abuse treatment. Because Father never engaged in consistent drug treatment, he never received the recommendation. Father did not complete any other parenting education programs.

{¶ 18} In addition to testifying about Father's limited progress on the case plan, the caseworker also testified about the Agency's attempts to find family members with whom J.M. could be placed. The caseworker explained that at one point, J.M.'s paternal grandmother had filed a motion to obtain custody, but later withdrew the motion as she was unable to care for the child. Until Paternal Aunt moved to intervene in the case on March 7, 2024, no other relatives had indicated a desire for custody of J.M.

{¶ 19} J.M.'s Foster Mother testified that J.M. was placed in her home on August 8, 2023. J.M. is bonded with his foster mother and foster father. Foster Mother testified J.M. is "generally a very happy kid" who is doing "really well." J.M. loves the family dog and his pet fish, he has numerous friends in the neighborhood with whom he plays, he enjoys the game of chess, going sailing, building things, and riding his bike alongside Foster Mother when she goes for a run.

{¶ 20} Foster Mother testified that when J.M. was first placed in her home, J.M. was very hard to understand, was behind in his language skills, and was academically behind his school peers. Testing revealed that he is likely dyslexic. Foster Mother and Foster Father have worked with J.M., obtained a private tutor to help him with his reading and decoding skills, and are consistent with his speech therapies. J.M. is now on par with his peers in math and science and is improving in his speech and literacy. Foster Mother testified that if the juvenile court were to grant permanent custody of J.M. to the Agency, she and her husband hoped to adopt him.

{¶ 21} An adoption supervisor with the Agency testified that if permanent custody of J.M. was granted, the case would be transferred to the adoption unit. Within 60 days of the transfer, the Agency would conduct meetings to match the child with adoptive families. The Agency would consider any individual interested in adopting J.M., including Paternal Aunt, so long as the interested individuals completed an application for adoption.

**{¶ 22}** Father elected not to testify on his own behalf at the hearing, and he did not call any witnesses in support of his motion for custody. On July 2, 2024, the magistrate issued a decision denying Father's motion for custody and granting the Agency's motion for permanent custody. The magistrate found that J.M. had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period and that a grant of permanent custody to the Agency was in J.M.'s best interest. Father filed objections to the magistrate's decision, arguing that the decision was against the manifest weight of the evidence and was contrary to J.M.'s best interest. On January 25, 2025, following a hearing, the juvenile court issued a decision overruling Father's objections. The court stated, in pertinent part, the following:

> Upon consideration of the pertinent statutes and case law, testimony, exhibits, and case file, the Court finds that the Decision of the Magistrate is not against the manifest weight of the evidence. The Court finds the testimony presented by the Agency's witnesses to be credible based upon a review of the transcript. The Court finds in weighing the evidence that there is substantial credible evidence that is both clear and convincing to terminate parental rights and award permanent custody to the [Agency].
>
> The Court further finds, having considered the relevant statutes and facts of this case regarding the best interest of the child, that there is substantial credible evidence that is both clear and convincing that it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the [Agency].
>
> IT IS ORDERED, that the Objections to the Decision of the Magistrate hereby be overruled in their entirety.
>
> IT IS FURTHER ORDERED, that this Court affirms the decision of the Magistrate to terminate the parental rights of Mother . . . and Father . . . and grant permanent custody of the child . . . to the [Agency].

{¶ 23} Father appealed the juvenile court's decision, raising the following as his sole assignment of error:

{¶ 24} THE TRIAL COURT'S DECISION AWARDING PERMANENT CUSTODY OF J.M. TO THE STATE IS AGAINST THE WEIGHT OF THE EVIDENCE.

{¶ 25} Father challenges the juvenile court's decision to grant permanent custody of J.M. to the Agency, contending the court's determination that permanent custody was in J.M.'s best interest was against the manifest weight of the evidence.

{¶ 26} Before a parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 2015-Ohio-4315, ¶ 11 (12th Dist.), citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982). Under R.C. 2151.414(B)(1), a juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 2014-Ohio-2580, ¶ 9 (12th Dist.); *In re A.M.*, 2020-Ohio-5102, ¶ 18. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 2014-Ohio-2896, ¶ 21 (12th Dist.); R.C. 2151.414(B)(1). Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 2015-Ohio-3709,

- 10 -

¶ 10 (12th Dist.). Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re H.G.*, 2023-Ohio-4082, ¶ 58 (12th Dist.).

**{¶ 27}** "Because R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, 'the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination . . . .'" *In re E.V.*, 2024-Ohio-192, ¶ 25 (12th Dist.), quoting *In re Z.C.*, 2023-Ohio-4703, ¶ 11.[5] Sufficiency of the evidence is a test of adequacy to determine if the evidence is legally sufficient to sustain a decision, while weight of the evidence relates to the issue of persuasion and the effect of the evidence in inducing belief. *In re Z.C.* at ¶ 13; *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley* at ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the [decision]." *In re M.A.*, 2019-Ohio-5367, ¶ 15 (12th Dist.).

**{¶ 28}** With respect to the second part of the two-part permanent custody test, the

---

5. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

juvenile court determined that J.M. has been in the Agency's temporary custody for at least 12 months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d). Father does not contest the juvenile court's 12 of 22 determination, and the record reflects that J.M. has been in the Agency's custody since his removal from Father's home on June 24, 2022.[6]

{¶ 29} The only issue remaining is whether an award of permanent custody to the Agency was in J.M.'s best interest. When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors. *In re D.E.*, 2018-Ohio-3341, ¶ 32 (12th Dist.). These factors include, but are not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.C.*, 2018-Ohio-1687, ¶ 22 (12th Dist.), citing R.C. 2151.414(D)(1)(a) thru (e). The factors in R.C. 2151.414(E)(7) through (11) involve a parent's having been convicted of or pled guilty to specific criminal offenses against the child, the child's sibling, or another child who lived in the parent's household; a parent's withholding of medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's

---

6. With respect to the 12 of 22 provision, temporary custody is deemed to begin on the date that the child is adjudicated as abused, neglected, or dependent or 60 days after the child's removal from the home, whichever occurs earlier. R.C. 2151.414(B)(1)(d); *In re S.H.*, 2015-Ohio-1763, ¶ 21 (12th Dist.). In the present case, the earlier date was the date of the dependency adjudication (August 19, 2022), as 60 days following J.M.'s removal from parental custody (June 24, 2022) was not until August 23, 2022.

abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. *In re A.M.*, 2020-Ohio-5102 at ¶ 19.

{¶ 30} The record reflects that the court considered the best interest factors set forth in R.C. 2151.414(D) and found that it was J.M.'s best interest to grant permanent custody to the Agency. Father challenges the court's finding, arguing the court failed to give sufficient weight to the bond he and J.M. share, his willingness to participate in a drug-treatment program, and his ability to provide a home and suitable income to support J.M.'s needs.

{¶ 31} Following our review of the record, we find no merit to Father's argument. The juvenile court's best interest determination is supported by clear and convincing evidence and is not against the manifest weight of the evidence. In examining J.M.'s interaction and interrelationship with Father and his paternal family, the juvenile recognized that Father and J.M. are bonded, have a good relationship, and that J.M. "speaks positively about his father." However, Father was not consistent in visiting J.M. Multiple months passed in the fall of 2023 without Father visiting the child. Given that more than 90 days passed without Father visiting or maintaining any contact with J.M., the juvenile court found that Father had abandoned the child, as contemplated by R.C. 2151.414(E)(10).[7] As the juvenile court noted, "the lack of visitation between a parent and child for an extended period of time can indicate a lack of commitment to providing care for the child." As for J.M.'s relationship with Father's family, the court noted that J.M. had

---

7. R.C. 2151.414(E)(10) provides that in determining the best interest of a child, the court should consider whether "[t]he parent has abandoned the child." Pursuant to R.C. 2151.011(C), "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." The juvenile court found Father did not have contact with J.M. between May 2023 and March 8, 2024, and that "Father failed to rebut the presumption of abandonment. The child is an abandoned child as defined in R.C. 2151.011(C)." We find that this factor was an appropriate consideration in determining whether permanent custody to the Agency was in the best interest of J.M.

spent time with Paternal Aunt when he was younger and Paternal Aunt had recently started attending visitations with J.M.

{¶ 32} In addition to considering the child's relationship with Father and his paternal relatives, the juvenile court also considered J.M.'s custodial history, his current living situation, his relationship with the foster family, and his wishes, as expressed through the guardian ad litem. J.M. has been in the Agency's custody since June 24, 2022. He was placed in three other foster homes before being placed in his current foster home on August 8, 2023. J.M. is bonded with his foster parents, who have been consistent in providing him with the structure he needs. As the juvenile court noted, "[a]s a result of [foster parent's] attentiveness, the child has 'opened up' and 'blossomed.' . . . The foster family has proven itself capable of providing for the tangible and intangible needs of the child in the areas where he struggles." J.M.'s schooling has progressed, his speech and literacy issues are being addressed through tutors and therapies, and he has found friends and activities that he enjoys within his current community. The court noted that J.M. had informed the guardian ad litem that he "would love to stay" with the foster family, and the guardian ad litem had recommended that permanent custody be granted to the Agency.

{¶ 33} The juvenile court also considered Father's progress on case plan services, J.M.'s need for a legally secure placement, whether such placement could be achieved without a grant of permanent custody to the Agency, and whether the conditions that led to the Agency's involvement had been remedied. The record reflects that Father made some progress on case plan services but was ultimately unable to remedy the conditions that led to the Agency's involvement. On June 1, 2022, J.M. was found wondering unsupervised through a construction site when he was five years old. Father tested positive for cocaine, methamphetamine, and fentanyl at that time. When the Agency

followed up with the family after that incident, they found Father was engaged in erratic and disorderly behavior, requiring that law enforcement be called and that J.M. be removed from the home. Father was advised of his need to complete a substance abuse assessment and follow through with all recommended treatments, as well as his need to obtain and maintain stable housing and income, complete parenting education classes, and engage in case management services with the Agency if he wanted to reunify with the child.

{¶ 34} Though Father obtained a substance abuse assessment and briefly engaged in outpatient drug treatment through the CRC, his attendance was poor and he was unsuccessfully discharged from the program in May 2023. He then attended 20 days of inpatient services through CAT House, but he chose to leave the program without completing it. Father was not receiving any substance abuse treatment from May 2023 until April 12, 2024, when he restarted services at CRC. However, Father did not dedicate himself to substance abuse treatment at that time. Rather, Father refused a toxicology screening, rejected inpatient services, and was unsuccessfully discharged from the program on May 30, 2024.

{¶ 35} The record, therefore, supports the juvenile court's finding that "Father has failed to complete the most important aspect of his case, i.e., substance abuse treatment." The record further supports the juvenile court's finding that Father tested positive for illegal substances or refused to be tested throughout the pendency of the case. As late as March 8, 2024, Father was still testing positive for heroin metabolite, morphine, and fentanyl on drug screenings. Father's lack of progress in treating his substance abuse issues impacted his ability to complete another case plan service—parenting classes. The Agency had not provided a referral for parenting classes as Father had not demonstrated a consistent dedication to drug treatment.

{¶ 36} Though Father has a suitable home and earns an income as a painter, he has not demonstrated a commitment to financially support his son. As the juvenile court noted, though Father earns an income, he has only made one voluntary child support payment. The other two payments occurred after lottery winnings were intercepted and funds were seized through an involuntary assignment.

{¶ 37} "A child's life is not an experiment that can be left to chance." *In re G.W.*, 2019-Ohio-1586, ¶ 52 (12th Dist.). "'The law does not require the court to experiment with [a] child's welfare to see if [the child] will suffer great detriment or harm.'" *In re B.C.*, 2018-Ohio-2673, ¶ 30 (12th Dist.), quoting *In re R.S.-G.*, 2015-Ohio-4245, ¶ 53 (4th Dist.). Father has not demonstrated that he is willing to prioritize J.M.'s health, safety, and stability over his desire to use illegal substances. As the juvenile court found, Father "appears to be unable to make a solid commitment to his treatment for any length of time. . . . He does not appear committed to making a lasting change. . . . As long as the Father's sobriety is questionable, there will be doubts as to whether the child is getting the proper attention and guidance he needs in order to grow and remain safe."

{¶ 38} J.M. is in need of legally secure permanent placement. He has been in the Agency's temporary custody since June 24, 2022. Despite reasonable efforts by the Agency to assist Father in meeting case plan objectives to reunify with the child, Father has not demonstrated that he is capable of maintaining sobriety or providing a safe and stable environment for J.M. As this court has previously recognized, "'[a] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re I.C.*, 2022-Ohio-3101, ¶ 45 (12th Dist.), quoting *In re D.E.*, 2018-Ohio-3341 at ¶ 60. The juvenile court's decision granting permanent custody to the Agency provides this for the child as it offers J.M. the opportunity to be adopted by his current foster family or another loving family. Accordingly, we find that the juvenile court's

decision to grant permanent custody of J.M. to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Father's sole assignment of error is overruled.

{¶ 39} Judgment affirmed.

BYRNE and SIEBERT, JJ. concur.