[Cite as *In re E.V.*, 2024-Ohio-192.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

IN RE:                                    :

    E.V.                            :        CASE NO. CA2023-09-018

                                    :        O P I N I O N
                                             1/22/2024

                                    :

                                    :

                                    :


APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20213068


Holly M. Simpson, for appellant, Mother.

Andrew T. McCoy, Clinton County Prosecuting Attorney, and Danielle E. Sollars, Assistant Prosecuting Attorney, for appellee, Clinton County Children Services.


**HENDRICKSON, J.**

{¶ 1}   Appellant, the mother of E.V. ("Mother") appeals a decision of the Clinton County Court of Common Pleas, Juvenile Division, granting permanent custody of her daughter to a children services agency.

{¶ 2}   E.V. was born in July 2021, three months premature, and remained in the neonatal intensive care unit ("NICU") of the hospital for approximately three months after

her birth. Clinton County Children Services, who has a long history with E.V.'s parents, was concerned for the infant's well-being on release from the hospital and filed a complaint alleging E.V. was a dependent child. The agency was granted emergency temporary custody of E.V. on her release from the hospital. The trial court adjudicated E.V. as a dependent child in September 2021 and granted the agency temporary custody in October 2021.

**{¶ 3}** Over a year later, in November 2022, the agency filed a motion for permanent custody of the child, alleging that E.V. had been in agency custody for 12 of 22 months and could not be placed with her parents within a reasonable time. The trial court held a hearing over two dates in April and May where it heard testimony from the agency caseworker, the foster mother, Mother, and E.V.'s father ("Father").[1]

**{¶ 4}** At the hearing, the agency caseworker testified that the agency has a history with the family dating back to 2002 when the agency was involved with Mother, her previous husband, and their children. The agency's involvement did not include court intervention in the early years but in 2019, after Mother and Father married, complaints were filed primarily because of domestic violence between Mother and Father. The children were placed with an aunt and a case plan was prepared with reunification as the goal. When Mother and Father had another son, he was added to the agency case plan as well.

**{¶ 5}** In addition, during the time Father and Mother were living together, Father's two older children were involved in a case in Montgomery County and were removed from the home. Permanent custody of Father's two older children was granted to Montgomery County Childrens Services in 2019.

---

1. Father has not appealed the trial court's decision and, because Mother's arguments relate only to her ability to care for the child, our discussion of the facts focuses primarily on those facts related to Mother.

**{¶ 6}** The agency caseworker testified that the agency's concerns regarding the family included domestic violence between the parents and Mother's inability to follow a protection order and remove herself and the children from a volatile situation. In addition, there were truancy and educational concerns with Mother's older children and mother's mental health was an issue. Housing was also an issue, as Mother was evicted during the case and was later living in a one-bedroom house with over 10 cats while trying to reunify with the children.

**{¶ 7}** The caseworker indicated Father has a substantial criminal history involving charges of domestic violence, burglary, criminal trespass, and abduction. He had also been charged in the past with child endangering that involved the leg fracture of his significant other's two-year-old child. Mother also has a criminal history, as she was charged with assault, but pled to disorderly conduct.

**{¶ 8}** While Mother and Father were working the case plan for the older children, E.V. was born. There were concerns because although the parents were not living together, they were still in a relationship. The agency was also concerned because E.V. had extremely high special needs because of her premature birth and required ongoing medical care and doctor visits. Given the family's history, the agency did not believe Mother had the ability to care for and protect the infant. While E.V. was in the hospital, the parents were not actively engaged in the child's medical care and visited the infant only 16 times during the three months EV was in the NICU. The agency had to make adjustments in caseworkers due to the parents' hostility when discussing safety plan options on E.V.'s release from the hospital. Father was charged and convicted after he threatened one of the caseworkers.

**{¶ 9}** On release from the hospital, E.V. was placed in foster care. Although the agency inquired, the aunt who had custody of E.V.'s sibling and half-siblings was unable

to take custody of the infant. E.V. was added to the case plan that was in place for the older children, which among other items, involved the parents maintaining safe housing, completing domestic violence courses, mental health counseling for both parents, and anger management for Father. Mother and Father made little progress on the case plan and eventually, legal custody of the older children was granted to the aunt. The case plan was then amended to remove the older children, but the goals for the parents remained the same.

{¶ 10} The caseworker testified that the parents still have not made sufficient progress on the case plan to reunify with E.V. Suitable housing is still a concern as Mother did not have independent housing and there were concerns when the caseworker visited the home Mother was living in with her mother. The caseworker indicated that although some of the initial concerns were remedied on a subsequent visit, the caseworker spoke with Mother about the need to obtain independent housing. Mother told the caseworker that she got an apartment, but Mother never moved. The caseworker testified that Mother and Father have a history of being evicted from rental properties. The caseworker further testified that the grandmother was unable and unwilling to take care of E.V. initially in the case and refused a drug test when requested during a visit to the home.

{¶ 11} According to the caseworker, although Mother completed a domestic violence course in October 2019, and engaged in some family therapy and mental health services, the agency did not consider the domestic violence concern alleviated because Mother did not display a change in behavior. In January 2020, Father was found hiding in a closet of Mother's apartment during an agency visit. In October 2020, Father assaulted Mother's son and Mother minimized Father's behavior. In June 2021, Mother assaulted a roommate. The caseworker indicated that although there have not been

arrests, there have been continued, ongoing police reports and calls involving Mother.

{¶ 12} With regard to Mother's mental health, the caseworker testified that Mother has not made significant progress to alleviate the agency's concerns. The court ordered Mother, who was diagnosed with depression, to complete a psychological evaluation and a pharmacology evaluation with a psychiatrist because there were concerns Mother needed ongoing mental health services. Mother was initially involved with treatment at Transformative Wellness, but services were discontinued due to a lack of progress. Mother later began treatment at Talbert House. The caseworker indicated that the last report she received from Talbert House was from December 2022 and at that time the therapist indicated Mother was making progress.

{¶ 13} However, the caseworker testified that Mother's behavior has not changed. She indicated Mother is still consumed with Father, which was a major factor in the mental health concerns. The caseworker indicated that she meets monthly with Mother and Mother spends a majority of that time talking about Father and appears consumed with what is going on in his life. The caseworker described a couple of instances where Father was following Mother, but Mother did not call police or take the situation seriously and another time where Mother told the caseworker that Father cut the catalytic convertor on her vehicle, but again Mother did not call the police to report it. The caseworker explained that this behavior causes concerns for the children because Mother appears unable to take adequate safety precautions.

{¶ 14} The caseworker further testified that there were some concerns with the children's welfare during visits and the parents had to be redirected. There were concerns that E.V. was sleeping face-down on her parents' chests during visits which was unsafe because it caused breathing concerns. The parents also fell asleep during visits and had to be woken up. In addition, there were interaction concerns as the parents spent

significant time on their phones during visits.

{¶ 15} The caseworker indicated that the agency is unable to assess Mother's ability to meet E.V.'s special needs and medical concerns because of the lack of progression during the case. The agency arranged for Help Me Grow services to come and work with E.V. during Mother's visits, but this only occurred once because Mother cancelled or "no-showed" subsequent visits and so they were unable to assess whether Mother could meet E.V.'s needs. Likewise, there were concerns because Mother did not consistently visit E.V. during the course of the case. According to the caseworker, at times Mother would visit regularly, and then at times she would not. The caseworker testified that 138 visits were offered to Mother. Mother confirmed 118 of these visits, but attended only 83 visits. Although a few visits were cancelled due to the child's illness or agency-related issues, Mother cancelled or failed to show at 22 of the visits she confirmed. Due to Mother's problems with attending visitation, the agency required Mother not only to confirm the day before a visit, but also to arrive one hour early to the visit and E.V. would only be transported to the visit after Mother arrived.

{¶ 16} There were also issues with Mother's hostility towards caseworkers as she was verbally hostile and walked out on occasion. The caseworker explained that it was not unusual for parents to be upset or short-tempered, but Mother displayed a level of hostility that was not common. Because of these issues, visits remained supervised and Mother never progressed to unsupervised visitations.

{¶ 17} The foster mother testified at the hearing that E.V. has been with the family since she was released from the hospital and is now almost two years old. Because she was born prematurely, the foster mother was given specialized training at the NICU to learn to care for E.V., including instruction on feeding, which was difficult because E.V. was underdeveloped. Initially, on release from the hospital, E.V. required eye

appointments, NICU appointments every two weeks, along with pulmonary/heart appointments. The foster mother estimated that E.V. had around 70 medical appointments in her first year. At the time of the hearing, E.V. was working with a Help Me Grow specialist every two weeks for physical therapy and speech therapy. E.V. also attends physical therapy sessions at Childrens Hospital because of issues that were present when she began crawling. The hospital is now working with E.V. on balance with walking and muscle strengthening in the child's legs. At the time of the hearing, E.V. was almost ready to be released from the NICU to go to regular doctor appointments and was gaining weight and meeting milestones. She is bonded to her foster parents and foster brother.

{¶ 18} Foster mother works with special needs children in school and works part-time so that she can transport E.V. to doctor's appointments. Her mother and aunt watch E.V. while foster mother works, in order to avoid daycare and issues with E.V.'s underdeveloped immune system.

{¶ 19} The foster mother testified that E.V. becomes "very clingy" after visits with her biological parents and she and her husband (foster father) have to spend a lot of time after visits holding the child. Foster mother indicated that the family is interested in adopting E.V. and would consider facilitating sibling relationships if that were appropriate.

{¶ 20} Mother testified at the hearing that she has been separated from Father for two years. She indicated she has two houses lined up to visit as possible rentals and was going to talk to a lady about another the following day. Mother indicated that she works at Papa John's delivering pizzas. She explained that she did not call police when Father was following her because she was working and could not stop, and further stated that she had called police about the catalytic converter but the police would not do anything because she and Father were still married. She testified that she completed a

domestic violence class at the start of the case, is on medicine for depression and is in therapy at Talbert House. She believes her mental health has changed, she has been cooperating with the agency, and that she has the ability to provide safe and stable housing for E.V.

**{¶ 21}** The trial court issued a decision granting permanent custody of E.V. to the agency on August 17, 2023. Mother now appeals that decision, raising the following assignment of error for our review:

**{¶ 22}** THE TRIAL COURT'S DECISION TO GRANT PERMANENT CUSTODY TO THE AGENCY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THERE WAS INSUFFICIENT EVIDENCE TO AWARD PERMANENT CUSTODY.

**{¶ 23}** Pursuant to R.C. 2151.414(B)(1), a juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9; *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 18. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-

3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio- 3188, ¶ 12. *In re H.G.*, 12th Dist. Butler No. CA2023-06-069, 2023-Ohio-4082, ¶ 58

**{¶ 24}** Before a parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state must prove by clear and convincing evidence that the above statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, paragraph three of the syllabus (1954).

**{¶ 25}** Because R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, "the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, ¶ 11. In this case, Mother argues both that the trial court's decision is not supported by sufficient evidence and that it is against the manifest weight of the evidence.

**{¶ 26}** Sufficiency of the evidence is a test of adequacy to determine if the evidence is legally sufficient to sustain a decision, while weight of the evidence relates to the issue of persuasion and the effect of the evidence in inducing belief. *Id.* at ¶ 13;

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 19. Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *In re L.B.*, 10th Dist. Franklin Nos. 19AP-644, 19AP-645, 2020-Ohio-3045, ¶ 29.

**{¶ 27}** In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley* at ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the [decision]." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15.

**{¶ 28}** The trial court found that E.V. had been in agency custody for 12 of 22 months and that finding is not challenged on appeal.[2] Instead, Mother's arguments relate only to the trial court's best interest determination. She argues that the trial court's decision is not supported by sufficient evidence and is against the manifest weight of the evidence because she has satisfied the main concern of the agency and has removed

---

2. We note that the trial court also determined that the child could not be placed with either of her parents within a reasonable time pursuant to R.C. 2151.414(B)(1)(a). This factor only applies when the other factors are not present. *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139 and CA2009-11-146, 2010-Ohio-1122, ¶ 22. However, a trial court does not err by applying both R.C. 2151.414(B)(1)(a) and (d) as alternative bases for a grant of permanent custody. *In re L.W.*, 10th Dist. Franklin Nos. 17AP-586 and 17AP-587, 2018-Ohio-2099, ¶ 13.

herself from Father. She also argues housing concerns were addressed, she is undergoing mental health treatment, and there were no concerns while she visited E.V. Mother further argues that she and E.V. are bonded and E.V.'s siblings are in relative custody and will have no relationship with E.V. if she is in the permanent custody of the agency.

{¶ 29} The trial court considered the evidence presented at the hearing and in considering the best interest factors, determined that E.V. has been with the same foster family and is doing well in that placement. The court further found that the guardian ad litem assigned to the case recommended that permanent custody be granted to the agency. The court determined that a legally secure placement could not be assured without a grant of permanent custody to the agency. In making this determination, the court considered the length of time the child has been in foster care, the repeated behavioral patterns of the parents, the prior removal of children from the parents' custody, the long-term treatment needs of Mother in regard to her mental health, the parents' limited progress on the case plan, and the fact that no secure relative placement was available. Finally, the court found that the parents have repeatedly failed to substantially remedy the conditions that caused the child to be placed outside the home.

{¶ 30} We find that the trial court's determination that it was in E.V.'s best interest to grant permanent custody to the agency was not against the manifest weight of the evidence. With regard to Mother's argument that she is no longer with Father and that she is undergoing mental health treatment, we note that it is well established that the completion of certain case plan requirements does not preclude a grant of permanent custody. *In re Mraz*, 12th Dist. Brown Nos. CA2002-05-011 and CA2002-07-014, 2002-Ohio-7278, ¶ 13. Instead, a case plan is merely a means to a goal and not a goal in itself. *In re S.U.*, 12th Dist. Clermont No. CA2014-07-047, 2014-Ohio-5166, ¶ 35. Here, despite

Mother's assertion that she is engaged in mental health treatment and is no longer in a relationship with Father, serious concerns remained. As discussed, the caseworker testified that initially in the case, despite a protection order, Mother was still in a relationship with Father. Although they are no longer together, Mother is still overly concerned about Father's activities, continues to minimize his behavior, and has not shown that she takes concerns seriously. These issues reflect not only on Mother's ability to protect herself, but also on her ability to protect E.V.

{¶ 31} In addition, Mother's visitations were inconsistent, and because of missed visits, including those with the Help Me Grow program, Mother's visitations were never increased or extended to unsupervised visitation. Accordingly, the agency was unable to determine whether Mother could meet the child's special needs. Further, this inability to even maintain regular visitation does not show that Mother is able to exhibit the high level of commitment required by the child's special needs.

{¶ 32} Although E.V. has a bond with Mother, she has been in foster care since her release from the hospital. Despite opportunities to do so, Mother has not shown over the history of the case that she is committed and able to care for and protect E.V. The child's foster parents have met all E.V.'s considerable special needs and are interested in adopting her. As this court has previously recognized, "[a] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security." *In re M.G.*, 12th Dist. Warren No. CA2020-10-070, 2021-Ohio-1000, ¶ 44. The juvenile court's decision to grant permanent custody of E.V. to the agency provides this for the child. Accordingly, we find the trial court's decision is not against the manifest weight of the evidence and is therefore supported by sufficient evidence. Mother's assignment of error is overruled.

**{¶ 33}** Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.