[Cite as *In re P.M.*, 2024-Ohio-4958.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| P.M. | : | CASE NO. CA2024-06-048 |
| | : | O P I N I O N<br>10/15/2024 |
| | : | |
| | : | |
| | : | |

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2022JC05471

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Katherine Terpstra, Assistant Prosecuting Attorney, for appellee.

Christopher Bazeley, for appellant.

**HENDRICKSON, J.**

{¶ 1}  Appellant, the biological father of P.M., appeals from a decision of the Clermont County Court of Common Pleas, Juvenile Division, granting permanent custody of his son to appellee, the Clermont County Department of Job and Family Services ("the Agency").  For the reasons discussed below, we affirm the juvenile court's decision.

{¶ 2}  P.M. was born on January 12, 2022.  At the time of his birth, both he and

Mother tested positive for amphetamines. P.M.'s biological father was unknown.

{¶ 3} On March 31, 2022, the Agency filed a complaint alleging that P.M. was an abused child. The complaint noted that despite Mother and P.M. testing positive for amphetamines, Mother had denied using the substance and had claimed she was drugged by another person. Mother refused multiple attempts by the Agency to drug test her in the weeks after P.M.'s birth. However, once screened, Mother tested positive for methamphetamine. Following a hearing on March 31, 2022, the juvenile court placed P.M. in the Agency's temporary custody and appointed a court-appointed special advocate (CASA) for the child.

{¶ 4} P.M. remained hospitalized due to medical problems unrelated to his drug toxicology until April 12, 2022. When he was discharged, he was placed in a therapeutic foster home. An adjudicatory hearing was held on April 19, 2022. At that time, the Agency verbally amended its complaint to allege that P.M. was a neglected child. Following admissions made by Mother, P.M. was adjudicated a neglected child. A dispositional hearing was held on May 17, 2022. In both instances, the juvenile court continued the order of temporary custody with the Agency. Mother was granted visitation with P.M. twice a week. However, after she failed to consistently visit with the child, visitation was modified to once per week.

{¶ 5} The Agency created a case plan for Mother's reunification with the child, and this plan was adopted by the juvenile court. The case plan required Mother complete a substance abuse assessment and follow through with all recommended treatments, complete a mental health assessment and follow through with all recommended treatments, obtain and maintain stable housing and income, and complete parenting education classes. Though Mother began working on case plan objectives by undergoing a drug assessment with Brightview and starting outpatient services, she was

unsuccessfully discharged from the program in June 2022.  Mother continued to use and test positive for methamphetamine.

{¶ 6}   On October 5, 2022, genetic testing established Father as the biological father of P.M.  Father entered an appearance in the juvenile case and was added to the existing case plan with the goal of reunifying P.M. with Father.  Father had the same case plan services as Mother.   He was to undergo substance abuse and mental health assessments and comply with any recommended treatments, obtain and maintain stable housing and income, and complete parenting education.

{¶ 7}   Father was granted weekly visitation with P.M.  Father exercised visitation until he was arrested on October 27, 2022.  Father remained in jail from October 27, 2022 until December 2, 2022, at which time he was moved to Talbert House Community Corrections Center (CCC), a lock-down residential treatment facility.  Father was housed at CCC until May 1, 2023.  While in lockdown at CCC, Father engaged in drug treatment, mental health counseling, and parenting classes.

{¶ 8}   Once released from CCC on May 1, 2023, Father resumed visiting P.M.  However, he was arrested for a probation violation on June 22, 2023.  He was sent back to CCC for another 90 days.  Upon being released from the CCC on October 1, 2023, Father again resumed visitations with P.M.  While both Mother and Father were fairly consistent in visiting with P.M., they made limited progress on case plan objectives.  Mother was unsuccessfully discharged from a second drug treatment facility and continued to test positive for methamphetamines.  Neither Mother nor Father had reported being employed to the Agency or had obtained independent, stable housing.  They were reportedly staying with P.M.'s maternal grandmother, who had at one point sought to evict Mother from the home.

{¶ 9}   The Agency requested and was granted extensions of temporary custody

of P.M. on February 27, 2023 and on July 27, 2023. On September 6, 2023, following limited progress on the case plan by Mother and Father, the Agency filed a motion for permanent custody of P.M. A hearing before a magistrate was scheduled for November 17, 2023. Prior to the hearing, on November 8, 2023, the CASA filed a report recommending that the Agency be granted permanent custody of P.M.

{¶ 10} At the permanent custody hearing, the magistrate heard testimony from a staff attorney for the Clermont County Child Support Enforcement Agency (CSEA), the Agency caseworker assigned to P.M.'s case, P.M.'s foster mother, and an adoption supervisor for the Agency. The CSEA staff attorney testified that in November 2022, Mother had been ordered to pay child support in the amount of $115.52 per month. Mother had not made any support payments and had an arrearage of $1,585.25. After Father's paternity was established, he was ordered to pay $134.81 per month as child support. Father had not made any payments and, at the time of the permanent custody hearing, had an arrearage of $1,843.57.

{¶ 11} The Agency caseworker assigned to P.M.'s case testified about the Agency's involvement, P.M.'s placement history, and Mother's and Father's limited progress on the case plan. The caseworker explained that the Agency had been granted emergency temporary custody of P.M. on March 31, 2022. He has remained in the Agency's temporary custody since that date. When P.M. was released from the hospital in mid-April 2022, he was placed in a therapeutic foster home due to "significant medical concerns," which included neurological issues and the need to obtain nutrition through a g-tube. In December 2022, he was moved to a different therapeutic foster home, where he has remained. P.M. is "doing wonderful" in his foster placement; he is very bonded to his foster parents and another child the family is fostering. The caseworker explained that P.M.'s current foster home was a potential "adoptive home" for the child.

{¶ 12} With respect to Mother's case plan progress, the caseworker testified that Mother obtained a drug assessment from Brightview in April 2022 and it was recommended that she receive outpatient treatment. Mother attended treatment for approximately two weeks before she stopped attending services. Mother was unsuccessfully discharged from Brightview in June 2022. Mother did not seek any new treatment until May of 2023, when she obtained a substance assessment and a mental health assessment from the Clermont Recovery Center. The recovery center recommended both mental health treatment and intensive outpatient drug treatment. Mother attended a few sessions but stopped engaging in services after June 20, 2023. She was unsuccessfully discharged from Clermont Recovery Center. Mother did not seek any additional mental health or substance abuse treatments until the day before the permanent custody hearing. The caseworker was notified that both Mother and Father had gone to Clermont Recovery Center for mental health and substance abuse assessments on November 16, 2023, though the caseworker had not been provided with the results of those assessments.

{¶ 13} The caseworker testified that Mother has continued to abuse drugs throughout the pendency of the case. Mother's drug of choice is methamphetamine. Mother has had 19 positive drug screens since the start of the case. Mother tested positive in screens administered by the Agency and in screens administered at treatment facilities. The Agency was last able to drug screen Mother on August 24, 2023. When the Agency attempted to visit Mother in September 2023 and obtain a drug screen, Mother kicked the caseworker out of the home. Mother was placed on probation at the beginning of August 2023, and when tested by her probation officer, she screened negative for any drugs on August 10, 2023 and October 3, 2023.

{¶ 14} Mother's drug use has impacted her ability to complete parenting courses.

Mother participated in parenting education, attending a 15-session program. However, the provider of the classes believed Mother was attending the sessions while under the influence and it unsuccessfully discharged Mother from the parenting course. Mother reengaged in parenting education at Child Focus on August 31, 2023 and has attended approximately seven sessions. She missed weekly sessions from October 5, 2023 to November 9, 2023, although many of those absences were due to illness.

{¶ 15} Mother had been living with her mother, P.M.'s maternal grandmother, throughout the pendency of the case. Mother's living situation is not stable. In September 2022, maternal grandmother filed an eviction action against Mother. Though maternal grandmother did not follow through with the eviction, maternal grandmother advised that Mother had to be moved out of the home by January 1, 2024.

{¶ 16} The caseworker testified the Agency tried to help Mother find housing. When Clermont Metropolitan Housing had availability, the caseworker gave Mother the organization's number. The Agency was prepared to help pay to get Mother moved into housing, so long as Mother was able to pay the rent moving forward. However, Mother was unable to get on Clermont Metropolitan's housing list and, to the caseworker's knowledge, had not found any other independent housing. Mother had also not reported any employment or income to the caseworker, though Mother recently indicated that both she and Father might be serving as caretakers for Father's mother, who had serious health issues.

{¶ 17} The caseworker testified that Mother has been fairly consistent in exercising her visitation with P.M. Mother's visitation was reduced from twice a week to once a week around the end of June 2022. Since then, Mother has routinely attended her weekly visits with P.M., missing only when she was ill or had car trouble. The caseworker testified Mother and P.M. appeared bonded to one another.

{¶ 18} As for Father's progress on the case plan, the caseworker testified that Father made progress while incarcerated and placed at CCC, as Father does "very well when he's in a lockdown, structured environment." However, the case worker noted, "[t]he problem is just when he is not in that type of environment, he's not able to follow through with what's needed to be done."

{¶ 19} While at CCC from December 2, 2022 until May 1, 2023, Father engaged in drug treatment and mental health counseling. When Father was released from CCC in May 2023, he had a negative drug screen. He went to Clermont Recovery Center for drug and mental health assessments, and it was recommended he receive treatment. Father attended a few outpatient sessions at the recovery center. However, on June 8, 2023 and June 15, 2023, he tested positive for methamphetamine. On June 22, 2023, Father was arrested for a probation violation and, when tested upon his arrest, again tested positive for methamphetamine. Father was sent back to CCC for 90 days and was released on October 1, 2023, about six weeks before the permanent custody hearing. CCC recommended that upon his release, Father engage in outpatient drug treatment. However, Father did not immediately engage in any substance abuse or mental health treatment. He waited until November 16, 2023, the day before the permanent custody hearing, before returning to the Clermont Recovery Center to reengage their substance abuse and mental health services.

{¶ 20} In addition to participating in drug and mental health services while housed at CCC, Father also completed a parenting course. Upon his most recent release from CCC in October 2023, Father enrolled in parenting classes at Child Focus with Mother.

{¶ 21} Father has not reported having a job or independent housing to the Agency. At one point he reported living with his parents and, at another point, reported living with Mother at maternal grandmother's home.

{¶ 22} The caseworker testified Father routinely visits P.M. when he's not incarcerated. However, due to Father's arrests and the time he's spent in lockdown, Father has not had consistent contact with P.M. When Father exercises visitation, the visits go well. P.M. appears happy to see Father and is affectionate towards him. However, the caseworker stated she "[c]an't say for sure that [P.M.] is specifically bonded to dad or if [P.M.] is just simply being his happy self and happy to see someone."

{¶ 23} In addition to testifying about Mother's and Father's progress on the case plan, the caseworker also testified about the Agency's attempts to find family members with whom P.M. could be placed. The caseworker explained efforts were made to place P.M. with various paternal relatives, including paternal grandparents. However, the paternal relatives never followed up with the Agency or returned the paperwork required to obtain a home study.

{¶ 24} P.M.'s foster Mother testified that P.M. has been placed in her home since December 21, 2022. P.M. is bonded with his foster parents and his foster sibling, who is only six months younger than P.M. Foster Mother described P.M. as a "very engaged, energetic little boy" who is playful and social. P.M. is in daycare and is doing well there. Foster Mother reported P.M. had his g-tube removed in April 2023, the tremors he was born with had lessened, and he now only requires yearly checkups with a neurologist. Foster Mother testified that if the juvenile court were to grant permanent custody of P.M. to the Agency, she and her husband hoped to adopt him.

{¶ 25} An adoption supervisor with the Agency testified that if permanent custody of P.M. was granted, the case would be transferred to the adoption unit and within 90 days, the Agency would conduct meetings to match the child with adoptive families. The Agency would reach out to any relatives of P.M. who might be interested in adopting the child, including those family members who the Agency had previously contacted about

taking temporary custody of the child.

{¶ 26} After considering the foregoing testimony, the magistrate issued a decision on January 19, 2024 in which it granted the Agency's motion for permanent custody. The magistrate found that P.M. had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period and that a grant of permanent custody to the Agency was in P.M.'s best interest. Father filed objections to the magistrate's decision, arguing that the decision was against the manifest weight of the evidence and was contrary to P.M.'s best interest. On June 11, 2024, following a hearing, the juvenile court issued a decision overruling Father's objections. The court stated, in pertinent part, the following:

> Upon consideration of the pertinent statutes and case law, testimony, exhibits, and case file, the Court finds that the Decision of the Magistrate is not against the manifest weight of the evidence. The Court finds the testimony presented by the Agency's witnesses to be credible based upon a review of the transcript. The Court finds in weighing the evidence that there is substantial credible evidence that is both clear and convincing to terminate parental rights and award permanent custody to the [Agency].
>
> The Court further finds, having considered the relevant statutes and facts of this case regarding the best interest of the child, that there is substantial credible evidence that is both clear and convincing that it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the [Agency].
>
> IT IS ORDERED, that the Objections to the Decision of the Magistrate hereby be overruled in their entirety.
>
> IT IS FURTHER ORDERED, that this Court affirms the decision of the Magistrate to terminate the parental rights of Mother . . . and Father . . . and grant permanent custody of the child to the [Agency].

{¶ 27} Father appealed the juvenile court's decision, raising the following as his sole assignment of error:

- 9 -

{¶ 28} THE JUVENILE COURT'S DECISION TO TERMINATE [FATHER'S] PARENTAL RIGHTS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 29} Father challenges the juvenile court's decision to grant permanent custody of P.M. to the Agency, contending the court's determination that permanent custody was in P.M.'s best interest was against the manifest weight of the evidence.

{¶ 30} Before a parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 2015-Ohio-4315, ¶ 11 (12th Dist.), citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982). Under R.C. 2151.414(B)(1), a juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 2014-Ohio-2580, ¶ 9 (12th Dist.); *In re A.M.*, 2020-Ohio-5102, ¶ 18. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 2014-Ohio-2896, ¶ 21 (12th Dist.); R.C. 2151.414(B)(1). Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 2015-Ohio-3709, ¶ 10 (12th Dist.). Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re H.G.*, 2023-Ohio-4082, ¶ 58 (12th Dist.).

{¶ 31} "Because R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, 'the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination . . . .'" *In re E.V.*, 2024-Ohio-192, ¶ 25 (12th Dist.), quoting *In re Z.C.*, 2023-Ohio-4703, ¶ 11.[1]  Sufficiency of the evidence is a test of adequacy to determine if the evidence is legally sufficient to sustain a decision, while weight of the evidence relates to the issue of persuasion and the effect of the evidence in inducing belief.  *In re Z.C.* at ¶ 13; *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19.  In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'"  *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley* at ¶ 20.  "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the [decision]."  *In re M.A.*, 2019-Ohio-5367, ¶ 15 (12th Dist.).

{¶ 32} With respect to the second part of the two-part permanent custody test, the juvenile court determined that P.M. had been in the Agency's temporary custody for at least 12 months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d).  Father does not contest the juvenile court's 12 of 22 determination, and the record reflects

---

1.  "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."  *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

that P.M. has been in the Agency's custody since April 19, 2022.[2]

{¶ 33} The only issue remaining is whether an award of permanent custody to the Agency was in P.M.'s best interest. When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors. *In re D.E.*, 2018-Ohio-3341, ¶ 32 (12th Dist.). These factors include, but are not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.C.*, 2018-Ohio-1687, ¶ 22 (12th Dist.), citing R.C. 2151.414(D)(1)(a) thru (e). The factors in R.C. 2151.414(E)(7) through (11) involve a parent's having been convicted of or pled guilty to specific criminal offenses against the child, the child's sibling, or another child who lived in the parent's household; a parent's withholding of medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. *In re A.M.*, 2020-Ohio-5102 at ¶ 19.

{¶ 34} The record reflects that the court considered the best interest factors set forth in R.C. 2141.414(D) and found that it was P.M.'s best interest to grant permanent

---

2. With respect to the 12 of 22 provision, temporary custody is deemed to begin on the date that the child is adjudicated as abused, neglected, or dependent or 60 days after the child's removal from the home, whichever occurs earlier. R.C. 2151.414(B)(1)(d); *In re S.H.*, 2015-Ohio-1763, ¶ 21 (12th Dist.). In the present case, the earlier date was the date of the neglect adjudication (April 19, 2022), as 60 days following P.M.'s removal from parental custody (March 31, 2022) was not until May 30, 2022.

custody to the Agency. Father challenges the court's finding, arguing the court failed to give sufficient weight to the bond he shares with P.M., his willingness to provide a secure placement for the child, and the fact that he "consistently attends visitation, when not interrupted by incarceration."

{¶ 35} After our review of the record, we find no merit to Father's argument. The juvenile court's best interest determination is supported by clear and convincing evidence and is not against the manifest weight of the evidence. Though P.M. appeared affectionate with Father, there was evidence presented that Father failed to maintain a consistent presence in P.M.'s life due to his incarceration. Father missed multiple months of visitations with P.M. from October 27, 2022 until May 1, 2023 and then again from June 22, 2023 until October 1, 2023 while he was in lockdown at CCC.[3] Due to the inconsistent contact, the Agency caseworker could not "say for sure that [P.M.] is specifically bonded to [Father] or if [P.M.] is just simply being his happy self and happy to see someone."

{¶ 36} Even if Father and P.M. are bonded with one another, that is but one factor in the best interest test, and "no one factor is entitled to more weight than the other factors." *In re A.C.*, 2023-Ohio-836, ¶ 54 (10th Dist.). In addition to considering the child's relationship with his biological parents, the juvenile court also considered P.M.'s custodial history, his current living situation, his relationship with the foster family, and his wishes, as expressed through the CASA given P.M.'s tender age. P.M. has been in the Agency's

---

3. Both the magistrate and the juvenile court in its discussion of the best interest factors found R.C. 2151.414(E)(10) applicable as it relates to Father. This provision provides that in determining the best interest of a child, the court should consider whether "[t]he parent has abandoned the child." *Id.* Pursuant to R.C. 2151.011(C), "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." The presumption of abandonment applies even where the parent is incarcerated. *See In re S.M.*, 2018-Ohio-4654, ¶ 15 (12th Dist.); *In re P.D.*, 2015-Ohio-2829, ¶ 21 (12th Dist.). The juvenile court found "Father had no contact with P.M. during his incarceration (October 2022-May 2023 and June 2023-October 2023). The child is an abandoned child as defined in R.C. 2151.011(C) insofar as his father is concerned." Father did not specifically challenge the abandonment finding by the juvenile court and we find that the factor was an appropriate consideration in determining whether permanent custody to the Agency was in the best interest of P.M.

custody since March 31, 2022, when he was two months old. When he was released from the hospital mid-April 2022, P.M. was placed in a therapeutic foster home. On December 21, 2022, P.M. was moved to a different therapeutic foster home, where he has since remained. P.M. is thriving in his current foster placement and is bonded with his foster parents and foster sibling. As the juvenile court noted, P.M. has lived with the foster family for 11 months, longer than he has lived anywhere else. The foster parents have expressed an interest in adopting P.M. if that becomes an option. The CASA assigned to P.M.'s case recommended that the Agency be granted permanent custody of the child.

{¶ 37} The juvenile court also considered Father's progress on case plan services, P.M.'s need for a legally secure placement, whether such placement could be achieved without a grant of permanent custody to the Agency, and whether the conditions that led to the Agency's involvement had been remedied. The record reflects that Father made some progress on case plan services but was ultimately unable to remedy the conditions that led to the Agency's involvement. The Agency first became involved in the case because P.M. and Mother tested positive for amphetamine at P.M.'s birth. Mother continued to test positive for methamphetamine thereafter. Father, once his paternity was established, was unable to care for the child, as he too had substance abuse issues as well as multiple instances of incarceration. Though Father engaged in drug treatment and mental health counseling while in lockdown at CCC, once released, Father failed to follow through on recommended substance abuse and mental health treatments. Father was released from CCC in May 2023. A month later, on both June 8 and June 15, 2023, he tested positive for methamphetamine. He was arrested for a probation violation on June 22, 2023 and once again tested positive for methamphetamine. After spending an additional 90 days at CCC, Father was released on October 1, 2023 with the

recommendation that he engage in outpatient drug treatment. Father did not seek drug treatment or mental health services until November 16, 2023—the day before the permanent custody hearing was set to commence. As the juvenile court noted, Father "has demonstrated that he is subject to relapse, and his continued relationship with Mother does not bode well for his sobriety."

{¶ 38} Father cannot provide stability or consistency for P.M. as Father is not in a position to provide for the needs of the child. Father has not paid any amount towards his child support obligation. He does not have independent housing, but either stays with his parents or stays with Mother at maternal grandmother's home—a home that he and Mother have been told they had to leave by January 1, 2024. There is no evidence in the record that Father holds a job.[4] As for the suggestion that Father would soon be employed to take care of the paternal grandmother, who had fallen ill, the juvenile court found that "[g]etting paid to take care of a sick relative does not appear to be a job that creates stability." This is especially true where the record does not contain any evidence as to the type of hours Father would be working or the income that he would receive for caring for his mother.

{¶ 39} P.M. is in need of legally secure permanent placement. He has been in the Agency's temporary custody since March 31, 2022. The juvenile court has already granted the Agency two extensions of temporary custody, the maximum number of extensions permitted by R.C. 2151.415(D)(4). During that time, neither Mother nor Father demonstrated they were capable of providing care for P.M. on a daily basis or capable of meeting his basic needs. As this court has previously recognized, "'[a] child's best

---

4. In his objections to the magistrate's decision, Father argued that he holds a job at a body shop. However, there was no evidence of Father's employment admitted at the permanent custody hearing. Father did not testify at the hearing or introduce any exhibits showing he was employed. The caseworker, when asked on cross-examination if Father had ever informed her that he was employed at a body shop answered, "He did not."

interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re I.C.*, 2022-Ohio-3101, ¶ 45 (12th Dist.), quoting *In re D.E.*, 2018-Ohio-3341 at ¶ 60. The juvenile court's decision granting permanent custody to the Agency provides this for the child as it offers P.M. the opportunity to be adopted by his current foster family or another loving family. Accordingly, we find that the juvenile court's decision to grant permanent custody of P.M. to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Father's sole assignment of error is overruled.

**{¶ 40}** Judgment affirmed.

BYRNE, P.J., and M. POWELL, J., concur.